**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George KELLEY, Defendant–Appellant.**

**No. 87–1262.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1987.

Decided June 14, 1988.

Rehearing and Rehearing En Banc
Denied Aug. 30, 1988.

Kenneth R. Sasse, Detroit, Mich., for defendant-appellant.

Wayne F. Pratt, Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.

George Kelley, pro se.

Before KEITH and WELLFORD, Circuit Judges; and HULL,* District Judge.

KEITH, Circuit Judge.

Defendant, George Kelley, appeals from his conviction after jury trial of conspiracy to possess, with the intent to distribute, heroin, 21 U.S.C. §§ 846 and 841(a)(1); conspiracy to import heroin, 21 U.S.C. §§ 963 and 960; possession, with the intent to distribute, heroin, 21 U.S.C. § 841(a)(1); and two counts of aiding and abetting interstate travel to carry on an unlawful activity 18 U.S.C. §§ 1952 and 2.[1] For the following reasons, we AFFIRM.

## I.

The evidence adduced at trial revealed the existence of a heroin smuggling and distribution ring, engaged in the transportation of heroin from Thailand for sale in the United States. The membership of the enterprise changed over its life, a fact of some importance to this appeal; however, the principal figure, Marian Lavern Lamp-

---

* Honorable Thomas G. Hull, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

1. In Count XII of the indictment, the Government sought to forfeit the Fill Building, which was owned by Kelley, and two vehicles owned by Kelley and Lampkin, pursuant to 21 U.S.C. § 853. The parties stipulated at trial to having the district court determine Count XII as it pertained to Kelley. On February 20, 1987, the district court ordered that both the building and the vehicles be forfeited.

kin, was an active participant throughout its existence.[2]

Lampkin became involved in the heroin trade as early as January, 1983, prior to Kelley's participation, which began in November, 1984. Lampkin became involved in the enterprise through her acquaintance with two Americans imprisoned in Thailand after narcotics convictions. Lampkin's role in the operation was two-fold: (1) the recruitment of couriers in the United States to receive Thai heroin from trans-Pacific couriers and deliver the heroin to domestic distributors; and (2) the arrangement of financing in the United States to purchase heroin from sources in Thailand.

### A. The "Washington, D.C. Deal"

Lampkin's participation in the conspiracy was revealed as a result of the seizure of ten and one-half kilograms of heroin by United States Customs Service agents, and the arrest of one Dr. Charlerm Chantrasook on November 9, 1983, in Seattle, Washington. Drug Enforcement Administration (DEA) agents secured the cooperation of Dr. Chantrasook, who told them that the heroin was destined for an individual named "Dave" residing in Washington, D.C., and who agreed to make a controlled delivery of sham heroin to "Dave." After his arrival in Washington, D.C., Dr. Chantrasook told the DEA agents that, in fact, his instructions were to make a telephone call to an Anne Lewis in Detroit.

Upon the urging of the DEA agents, Dr. Chantrasook called Lewis and made arrangements for her and her son, Cleophus, to come to Washington, D.C., and for Anne Lewis to meet him in a hotel room which had been wired for surveillance. During that meeting, on November 11, 1983, Lewis told Dr. Chantrasook that she had brought $120,000.00, and that she would take the heroin with her, return to her hotel room, and bring the money back to him. Upon leaving Dr. Chantrasook's room with the sham heroin, Anne and Cleophus Lewis were arrested. Subsequently, on November 13 or 14, a warrant to search a Detroit apartment shared by Lewis and Marian Lampkin was executed, and $37,000.00 was recovered, including $7,800.00 from Lampkin's purse. Both Anne and Cleophus Lewis entered pleas of guilty and were sentenced to ten and eight years, respectively.

### B. The "San Francisco Deal"

In early November of 1984, Marian Lampkin travelled to Bangkok, Thailand. Upon her return, she spoke with Woodrow Wilson, who testified that she told him that she had given his phone number to some people there that would give him information about heroin, which she referred to as "tea." Wilson testified that he did, in fact, receive a telephone call from an individual identifying himself as "Wong Sun," and who, after confirming that Wilson knew Lampkin, indicated that he was in San Francisco with the "tea." Wilson then made plans to go to San Francisco to pick up the "tea." Kelley paid for the airline ticket and gave Wilson money for his expenses.

Upon Wilson's arrival in San Francisco, he attempted to contact the courier Wong Sun, but was unsuccessful. Wilson then called Kelley, who told him "to stay out there for another day or so, maybe something would happen and he would show up." However, the courier did not appear. When Wilson ran out of money, he returned to Detroit.

Approximately two weeks later, Wilson received another telephone call, which he believed was made by another Thai courier. In fact, DEA agents had intercepted written instructions in Bangkok for another delivery, along with approximately eight-and-one-half kilograms of heroin, and had substituted a DEA agent for the courier. As a result of that conversation, Wilson, Lampkin and Kelley met at the Fill Building in Detroit, which Kelley owned and where he maintained his residence.[3] Wil-

---

2. Lampkin was indicted along with Kelley, and her prosecution was severed from that of Kelley. After she failed to appear for trial, she was convicted *in absentia.*

3. Kelley testified that he had become a co-partner in a corporation, Future Development Corporation, with Lampkin, and the offices of that organization were located in the Fill Building.

son testified that, at that meeting, the parties had agreed to use "music terms" connected with the recording industry when talking about heroin trafficking on the telephone.[4] In addition, Wilson informed the others that he had received a call from the "courier," who wanted $10,000.00 for the "package."

At a second meeting, at which Wilson, Lampkin, Kelley and Kelley's son, Michael, were present, it was agreed that Kelley would supply the $10,000.00 which the "courier" had requested for the heroin. After obtaining the money, Wilson flew to San Francisco, where he arrived either late on the night of December 14 or in the early morning hours of December 15. That morning, Wilson met with the "courier," gave her the $10,000.00, took possession of the heroin, and was arrested. Upon his arrest, Wilson was persuaded to cooperate in a controlled delivery, and told Lampkin in a telephone call that "the session went off beautiful."

The DEA agents then planned a delivery of sham heroin to the Fill Building in accordance with the existing plan. On December 18, Wilson, at the direction of the DEA agents, went to Kelley's apartment with two suitcases of sham heroin. When the agents, bearing search warrants, entered the first floor of the building amid shouts of "police," Kelley jumped up, broke out a window with an iron, and threw packages of the "heroin" out the window, cutting his finger in the process. Wilson kicked a remaining package under Kelley's bed, from where it was recovered.

### C. The "Los Angeles Deal"

Approximately one month after the controlled delivery at the Fill Building, Wilson received another call from a courier in Las Vegas who identified himself as "Chan Y." As in the "San Francisco deal," the caller told Wilson that he had received Wilson's number from Lampkin. Chan Y told Wilson that he had more than one-hundred grams of "tea" in Los Angeles, and that he would have to check with someone else

concerning more. Two weeks later, Wilson received a call at the same number from another courier in Los Angeles, and arrangements were made for Wilson to go to Los Angeles to pick up a shipment. After that transaction, in which an agent participated in an undercover capacity, two couriers were arrested and approximately five kilograms of heroin were seized.

### II.

Kelley's primary argument on appeal is that the evidence presented by the government at trial can be reasonably construed only as supporting a finding of multiple conspiracies. Because the indictments charged that Kelley was a member of one central conspiracy, Kelley asserts that the proofs at trial were at variance with the indictment, resulting in prejudice to Kelley and requiring reversal under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed.2d 1557 (1946).

In order to obtain a reversal due to a variance between the indictment and the evidence, a two-prong test must be satisfied: (1) the variance itself must be demonstrated; and (2) the variance must affect some substantial right of the defendant. *United States v. Grassi*, 616 F.2d 1295, 1302 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980); *United States v. Grunsfeld*, 558 F.2d 1231, 1238 (6th Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 219, 54 L.Ed.2d 152 (1977), and *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978). We do not reach the second prong, for we conclude that there was no variance between the indictment and the proofs.

"Whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury ... and [is] to be considered on appeal in the light most favorable to the government." *Grunsfeld*, 558 F.2d at 1238. Viewed in this light, the evidence allows a fair infer-ence that all three transactions were part of one overarching conspiracy to import

---

4. Wilson had been involved in the recording business in the 1970's. Also, Lampkin had

played in recording sessions with Wilson's recording company in the 1960's as a pianist.

heroin from Thailand to the United States, with Marian Lampkin as the central character. Wilson testified at trial that, prior to the "San Francisco deal," Lampkin told him that a woman roommate who had been working for her had been caught and given a ten-year sentence, apparently referring to Anne Lewis and the "Washington, D.C. deal." Lampkin's continued position as the procurer of couriers in the United States and the contact between those couriers and the Thai couriers was shown by her recruitment of Wilson for the "San Francisco deal" and her activities in Thailand which led the Thai couriers to contact Wilson. Furthermore, in the "Los Angeles deal," Wilson was again contacted by trans-Pacific couriers who had received his telephone number from Lampkin.

Although the enterprise engaged in three separate transactions, and the cast of characters changed over the course of the enterprise, this does not mean that there was not one conspiracy linking all three deals. "The unity essential to a conspiracy is derived from the assent of its members to contribute to a common enterprise. Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership." *Grassi*, 616 F.2d 1303. Here, the goal of the conspiracy remained the same throughout its life—the importation and distribution of heroin. Lampkin's role also remained the same through all three deals. Wilson acted as the American courier in both the "San Francisco deal" and the "Los Angeles deal," taking the place of the incarcerated courier Lewis. Although the procedure for exchanging money for heroin changed from a single transaction to a consignment arrangement between the first and second deals, the rest of the operation functioned in essentially the same way, with trans-Pacific couriers contacting the American courier who had been recruited by Lampkin. Therefore, we conclude that the evidence supported a finding that a single conspiracy existed.[5]

### III.

■ Next, Kelley argues that, if the Government indeed proved the existence of a single conspiracy, the evidence of the "Washington, D.C. deal" and the "Los Angeles deal" should nevertheless have been excluded because their prejudicial effect outweighed their probative value. Fed.R. Evid. 403. We do not agree.

The decision of the district court that the prejudicial effect of a particular piece of evidence is outweighed by its probative value is a matter of discretion, and may be reversed on appeal only if there was an abuse of discretion. *See United States v. Holloway*, 740 F.2d 1373, 1377 (6th Cir.) *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984). Moreover, "[i]n reviewing a district court's ruling on a Rule 403 objection, we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." 740 F.2d at 1378; *United States v. Brady*, 595 F.2d

---

**5.** Kelley correctly notes that no evidence was offered to show his participation in either the "Washington, D.C. deal" or the "Los Angeles deal." However, the issue of whether acts or statements made by co-conspirators before Kelly joined the conspiracy are admissible against Kelley is controlled by the ruling of the Supreme Court in *United States v. United States Gypsum Company*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948):

> With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.

333 U.S. at 393, 68 S.Ct. at 541; *see also United States v. Cassity*, 631 F.2d 461, 464 (6th Cir.

1980). Similarly, because the conspiracy continued after the termination of Kelley's involvement, statements and acts of co-conspirators in furtherance of the continuing conspiracy may be introduced against him. *United States v. Mason*, 658 F.2d 1263, 1269–70 (9th Cir.1981). Such statements are admissible despite the fact that, at the end of the "San Francisco deal" and during the "Los Angeles deal," Wilson was acting under the direction and surveillance of government agents. *United States v. Hamilton*, 689 F.2d 1262, 1269 (6th Cir.1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 753, 754, 74 L.Ed.2d 971 (1983); *United States v. Thompson*, 533 F.2d 1006, 1010 (6th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976).

359, 361 (6th Cir.1979), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979).

The probative value of evidence concerning the "Washington, D.C. deal" and the "Los Angeles deal" is clearly found within the government's right to prove the entire scope of the conspiracy. Indeed, Kelley's primary contention here is that the prejudicial impact of the evidence outweighed *any* probative value. However, the existence of other transactions, even if large quantities of narcotics are involved, does not inexorably lead to prejudice; Kelley was, after all, being tried for his role in a major narcotics conspiracy, and we are unwilling to say that the presence of the approximately ten-and-one-half kilograms of heroin seized in the "Washington, D.C. deal" and the approximately five kilograms of heroin seized in the "Los Angeles deal" unduly prejudiced Kelley when he was directly implicated in another transaction involving eight-and-one-half kilograms of heroin.

Moreover, the record of the government's argument before the jury reflects the fact that the Assistant United States Attorney took pains to inform the jury that Kelley was not directly involved in any transactions other than the "San Francisco deal":

> The conspiracy in this case is far-reaching. The evidence shows that the Marian Lampkin organization was involved in at least three different heroin trafficking incidents. We have divided them up as the San Francisco deal, the Los Angeles deal and the Washington, D.C. deal.
>
> As you know, the San Francisco deal was the one that was in December of 1984 and that is the only one of the three deals that these two defendants were involved in and that's what the evidence shows and we have never said anything differently.
>
> What the other two deals show, the Los Angeles deal and the Washington, D.C. deal show.... that the Marian Lampkin

organization had a continuing pattern of importing heroin from Thailand.

Under these circumstances, the district court did not abuse its discretion.

## IV.

Accordingly, for the foregoing reasons, the judgments of conviction are AFFIRMED.[6]

---

**6.** Kelley, in his two *pro se* briefs, raises several additional issues. Upon review, we conclude that all are without merit.