944 F.2d 1223
 33 Fed. R. Evid. Serv. 1254
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jerome Wilbert MADDOX (89-2084), Antoine Domino Maddox
(89-2165), Shirlenia Rutherford (89-2222), Zachary Aaron
Johnson (89-2223), Terrance Anthony Western (89-2246),
Anthony DeWayne Moore (89-2253), Kenneth Lee Johnson
(89-2269), Richard Allen Ford, Jr. (90-1167), Gaylon Charles
Terry (90-1255), Ronald Arnold (90-1265), and Michael
Anthony Glenn (90-1320), Defendants-Appellants.
 Nos. 89-2084, 89-2165, 89-2222, 89-2223, 89-2246, 89-2253,
89-2269, 90-1167, 90-1255, 90-1265 and 90-1320.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 23, 1991.
Decided Sept. 3, 1991.
Rehearing Denied in No. 89-2246
Oct. 1, 1991.
Certiorari Denied in No. 89-2223
Nov. 4, 1991.
See 112 S.Ct. 400.
As Amended on Denial of Rehearing Dec. 21, 1993.*
 
 Jennifer J. Peregord, Kenneth R. Chadwell, Jr. (argued and briefed), Office of the U.S. Atty., Detroit, Mich., Mark C. Jones, Asst. U.S. Atty., Flint, Mich., for U.S.
 Kenneth R. Sasse (argued and briefed), Detroit, Mich., for Antoine Domino Maddox.
 Daniel D. Bremer (argued and briefed), Flint, Mich., for Jerome Wilbert Maddox.
 David I. Megdell (argued and briefed), Flint, Mich., for Shirlenia Rutherford.
 John L. Belanger (argued and briefed), Sterling Heights, Mich., for Zachary Aaron Johnson.
 Rick L. Middleton (briefed), East Lansing, Mich., for Terrance Anthony Western.
 Arthur M. Fitzgerald (argued and briefed), Bay City, Mich., for Anthony DeWayne Moore.
 Charles A. Grossmann (argued and briefed), Flint, Mich., for Kenneth Lee Johnson.
 Arnold J. Shifman, Philip H. Seymour (argued and briefed), Cooper, Shifman, Gabe, Quinn & Seymour, Royal Oak, Mich., Clarence B. Tucker, Sr., Detroit, Mich., for Richard Allen Ford, Jr.
 Robert J. Dunn (argued and briefed), Bay City, Mich., for Gaylon Charles Terry.
 Richard J. Amberg (argued and briefed), Pontiac, Mich., for Ronald Arnold.
 Kenneth R. Sasse (argued), Detroit, Mich., Don Ferris (briefed), Ann Arbor, Mich., for Michael Anthony Glenn.
 Before GUY and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 BOGGS, Circuit Judge.
 
 
 1
 This consolidated appeal involves eleven different criminal defendants who were tried together (along with another defendant, who has not appealed) and convicted of various drug-related offenses, several of which involve firearms. The defendants raise various challenges to their convictions and sentences. We affirm all of the convictions and sentences.
 
 
 2
 * The various defendants in this case participated in running what was essentially a chain of cocaine houses located in the Flint, Michigan area. The operation began, as far as we can tell, in 1984. As early as October 1985, the Flint police began raiding the defendants' various drug houses and closing them down. Unfortunately, these raids resulted only in temporary shutdowns and changes of location rather than the cessation of drug-related activities. Despite the best efforts of the police, the defendants remained in business for several years.
 
 
 3
 The quantity of evidence presented at trial was overwhelming, and it would be pointless to discuss all of it in detail. The evidence can be divided into two main categories: evidence taken in connection with various raids of Maddox organization cocaine houses and the testimony of various persons who had contact with the conspiracy during the course of its operations. The government introduced evidence that the Maddox organization operated over a dozen cocaine houses from 1984 to 1988. Most of these were "crack houses"--houses or apartments where crack was sold on a retail basis in the form of "rocks"--but at least one was a "powder house"--specializing in the sale of powder cocaine. Lionel Keener, who worked at a number of locations as a doorman, testified for the government pursuant to a plea agreement. Keener testified that the houses at which he worked grossed over half a million dollars in 1987 alone. Other key witnesses included Dawn Lovett, who was Keener's girlfriend, Jerry Green, another former associate with the Maddox organization, and Trenace Cummings, Green's girlfriend and a former Maddox customer.
 
 
 4
 Like the workers at Adam Smith's pin factory, the members of the Maddox organization had specialized roles. The Maddox brothers, Jerome and Antoine, organized and led the conspiracy. Jerome seems to have been the driving force at the start, but Antoine took over the primary leadership position as time went on. They arranged, in a variety of ways, to obtain the use of houses and apartments from which they sold cocaine. The Maddox brothers operated at least a dozen drug houses over the course of this conspiracy. They supplied the cocaine to be sold, and they kept most of the profits. At crack houses, the Maddox brothers supplied the drugs already processed into crack, which was then cut and packaged into individual servings in "seal-a-meal" bags on the premises by various employees. Each location had a sales quota that it had to meet. When sales were sub-par, the Maddox brothers held meetings at which they would exhort the lower-level sellers to do a better job. Nor were they above getting their hands dirty. Both Antoine and Jerome Maddox personally sold cocaine in addition to hiring others to do it for them.
 
 
 5
 In addition to a great deal of more routine evidence, the trial featured an incident involving Jerome Maddox. Trenace Cummings, a former Maddox customer, testified on behalf of the government at trial. After the completion of her testimony, she contacted the prosecutor and indicated that she had been threatened by Jerome Maddox during the course of the trial. Quite properly, the government immediately informed the district court. The court then held a hearing outside of the presence of the jury. Cummings said that, during a break in the testimony, when the judge and the attorneys were busy with a sidebar discussion, Jerome Maddox silently mouthed the words "you're dead" to her. This took place early in her testimony, and she claims that it distracted her to the point that she was unable to concentrate on her testimony. Jerome Maddox disputed this. He testified that she had initiated the contact by attempting to speak to him during the sidebar, and that he had merely responded by mouthing the word "what." John Reghi, a Marshal assigned to the courtroom, gave a version of events that could be consistent with either story. He agreed that Maddox did move his lips, but indicated that he believed that the gesture was amorous. He did, however, admit that he was somewhat uncertain of this interpretation. The court made "findings," concluding that Cummings had not actually been threatened, but that she believed that she had been. It allowed her to retake the stand and give some additional information that she claimed had been left out of her prior testimony due to the distraction. In fact, her amplification of the prior testimony was not terribly significant--she simply added a few dates of events to which she had already testified. On cross-examination, one of the defendants' lawyers induced her to tell the jury what had distracted her. The jury was instructed that this evidence should be applied only against Jerome Maddox, not any of the other defendants.
 
 
 6
 As time passed, Antoine took over Jerome's role as the leader of the conspiracy. The witnesses who testified about activities at the start of the conspiracy tend to refer to Jerome and Antoine almost interchangeably, while the later witnesses clearly refer to Antoine as the leader. Although Antoine took over the leadership role, Jerome nonetheless continued to play an active role. Indeed, Jerome remained a leader, even when it was clear that Antoine was the man in charge. One example of this stands out. The testimony about the early days was that Antoine and Jerome both supplied cocaine, while testimony about later events refers to Antoine as the sole supplier. Unsurprisingly, as Antoine took exclusive responsibility for assuring that the drug houses were supplied with cocaine, the money increasingly went to him rather than to him and Jerome. Thus, many of the witnesses who were not involved from the start identify Antoine as the one person who made sure that each house had an adequate supply of drugs and to whom money was given. Evidently, two factors explain this change. First, when the conspiracy began, Antoine was temporarily confined to a wheelchair as the result of wounds sustained in a shooting. Antoine became more involved as he was able to walk. Second, Jerome became less capable as he began to consume his own product, unlike Antoine, who never took cocaine. Nonetheless, throughout the conspiracy, Jerome was in charge at a particular location if Antoine was not there himself for some reason.
 
 
 7
 Although it is clear that the Maddox Brothers supplied the individual retail drug houses with their supply of cocaine, less is known about how they got the cocaine. None of the confederates who participated in the retailing of the cocaine were involved in the wholesale acquisition of the drug. Since most of the evidence at trial resulted from police raids of individual drug houses or was garnered through the testimony of lower-level employees and customers, little of the evidence gave any idea of how the Maddox organization acquired its cocaine. One of the most hotly controverted issues in this case arises out of some of the small amount of evidence introduced by the government at trial regarding how the Maddox Brothers kept their operations supplied with cocaine. The government introduced evidence regarding the activities of Robert Ford. The only link from Ford to the rest of the organization was through his connection with Antoine Maddox. The government's theory was that the Maddox organization purchased cocaine from the Ray-Ray Browning organization in Los Angeles, California, and then transported the cocaine from California to Michigan. In so doing, the government introduced some evidence regarding the scope and extent of the Ray-Ray Browning cocaine operation.
 
 
 8
 Whatever means the Maddox Brothers used to acquire the cocaine, the government demonstrated conclusively that they did distribute a quite significant amount through the drug houses in the Flint, Michigan area. Keeping the business in the family, the Maddox Brothers employed two of their cousins--Kenneth and Zachary Johnson--as mid-level managers. Both Kenneth and Zachary were more highly paid than the normal lower-level sellers. Antoine or Jerome left Kenneth or Zachary Johnson in charge at a drug house if neither could be present. There was somewhat more evidence regarding Kenneth Johnson than his brother, but the evidence regarding each was more than adequate. Both brothers were linked to several different locations. There was direct testimony that each personally sold cocaine in large quantities.
 
 
 9
 Kenneth Johnson seems to have been a particularly trustworthy employee. He was given access to restricted storage areas where quantities of cocaine were stored prior to being cut for retail distribution. If one of the more minor sellers needed more, Kenneth Johnson was the one to ask. Furthermore, Kenneth Johnson also had one of the most important tasks--he often collected the proceeds from other sellers and delivered them to Antoine. One witness testified that she saw Kenneth give money to Antoine Maddox on at least fifty separate occasions.
 
 
 10
 In addition to the direct testimony regarding Kenneth Johnson's drug-selling activities, the judge also admitted some circumstantial evidence about him--to which several of the defendants, including Johnson himself, have strenuously objected. Twala Jones, Kenneth Johnson's former girlfriend, testified on behalf of the government. Part of her testimony dealt with an alleged attempt on the part of Kenneth Johnson to procure funds in order to escape. Kenneth told her that he needed money in order to avoid being arrested. Thus, in order to get money, he and Twala Jones planned and executed the robbery of her mother. Twala Jones was allowed to testify as to the bare fact of the robbery, but not to the details of the robbery.[1]
 
 
 11
 Selling cocaine is a rough business, and the Maddox organization was prepared for trouble. Guns were pervasive at each location. All of the persons who worked there had guns available. Sometimes, especially at night, they would meet persons at the door with guns drawn. Nor was their caution baseless. Lionel Keener chose to get out of the cocaine business because, once, while he was on duty at a Maddox crack house, a scuffle escalated to gunplay, and Keener was shot.
 
 
 12
 Although all of the members of the conspiracy had guns available to them in the course of their duties, Terrance Western (a/k/a "Mr. T") specialized in violence. Western regularly carried an automatic weapon. If someone became unruly or started making trouble, Western would "put them in order." John Wayne Wallace testified that, when Wallace was suspected of stealing some cocaine, Western put a gun to his head. Western performed other tasks as well. He ran one drug house (located at 1177 E. Princeton), and he occasionally acted as a courier of money, guns, or drugs.
 
 
 13
 There were several other defendants as well, whose involvement, while significant, was somewhat less extensive than the other principals. On two occasions, Shirlenia Rutherford assisted the Maddox Brothers in arranging for the use of various locations for drug dealings. She rented at least one apartment in her name for use by the conspirators, and she allowed her own residence to be used as a crack house. One of the issues in this case involves a raid of her apartment. Michael Glenn, Ronald Arnold, and Anthony Moore all worked at various locations during the course of the conspiracy as sellers, lookouts, and doormen. Arnold turned eighteen during the course of his conspiracy, and he contends that the government failed to provide sufficient evidence of criminal conduct after the age of eighteen. Lionel Keener also worked as a doorman at several locations. Keener pled guilty and provided extensive and detailed testimony about the drug activities.
 
 
 14
 After a long trial, the jury convicted almost all of the defendants on almost all of the counts. One lone defendant, William Jarrett, was charged with participating in the Maddox conspiracy, but acquitted. Jarrett, who was convicted of being a felon in possession of a firearm, has chosen not to appeal that conviction. Prior to sentencing, Gaylon Terry made a motion for a judgment of acquittal, maintaining that the evidence against him was not sufficient. When he heard oral argument on the motion, the trial judge told the prosecutor that he would put off ruling on the motion to give the government time to dig a key portion of evidence out of the trial record. Inadvertently, the court granted the motion without waiting for the prosecutor to respond by bringing forth the relevant testimony. The government then filed a timely motion for reconsideration in which it provided the court with testimony that it believed the court had initially overlooked. The court admitted that it had erred, granted the government's motion for reconsideration, and then denied Terry's motion for a judgment of acquittal.
 
 
 15
 The defendants make numerous assignments of error, objecting both to their convictions and sentences. We now turn to the merits of the more plausible claims.
 
 II
 
 16
 Several of the defendants, including Kenneth Johnson, object to the introduction of the evidence regarding his robbery of Twala Jones's mother. Twala Jones's testimony was that she and Kenneth Johnson robbed her mother in order to get money for him to escape. Although the court admitted the fact of the robbery itself, the court stopped Twala Jones before she could relate the brutal details of the violence committed in the course of the robbery.
 
 
 17
 The defendants maintain that the evidence of the robbery was not probative of Kenneth Johnson's guilt, or, alternatively, that the evidence was more prejudicial than probative. Kenneth Johnson's statements --that he feared (justifiably, it turned out) being convicted and therefore intended to flee--constitute verbal admissions on his part. The admissions were clearly relevant and, as Kenneth Johnson is a party to the litigation, his admissions, when offered by his opponent, the government, fall outside of the hearsay rule. Fed.R.Evid. 801(d)(2).
 
 
 18
 The defendants argue, however, that the evidence that he actually committed the robbery was not relevant and should not have been admitted. It is relevant inasmuch as it constitutes an attempt on his part to flee the jurisdiction. Flight evidence is probative of guilt where the jury could reasonably draw four inferences from the evidence:
 
 
 19
 "... (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."
 
 
 20
 United States v. Dillon, 870 F.2d 1125, 1127 (6th Cir.1989), quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977), cert. denied, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). Standing alone, evidence that a defendant under indictment for one crime committed a robbery would almost never be admissible as flight evidence. Robbing someone is not an act (such as packing bags) that would generally constitute a prelude to flight. Here, however, we have the evidence of the robbery together with Kenneth Johnson's admissions. He told Twala Jones that the purpose of the robbery was to get money to flee. He told her that the purpose of doing so was to avoid detection. Thus, the requirements of Dillon are satisfied by the evidence here because Kenneth Johnson's actions, when viewed in light of the reasons for his action supplied by his own admission, are strongly inculpating. Thus, the evidence that Kenneth Johnson actually committed a robbery is relevant in that it corroborates his admission. To be sure, it is possible that Kenneth Johnson fled because he feared being unjustly convicted, but Johnson was free to present that argument to the jury if he wished.
 
 
 21
 Nor can any of the other defendants complain. The jury was properly instructed that the evidence was to be used only against Kenneth Johnson, not against any of the other conspirators. As general rule, evidence can be introduced for a limited purpose--against a single member of a conspiracy, for example--so long as the court provides the jury with a properly-worded limiting instruction. See, e.g., United States v. Walker, 871 F.2d 1298, 1303 (6th Cir.1989); United States v. Holloway, 740 F.2d 1373, 1377 (6th Cir.1984).
 
 III
 
 22
 Several of the defendants argue that Trenace Cummings should not have been allowed to reassume the stand after the alleged threat from Jerome Maddox to give what one defendant characterized as the "new and improved version" of her testimony. There are actually two issues here. One concerns the propriety of allowing her to retake the stand, and the other is whether it was legitimate to allow her to testify about the alleged threat. Some defendants suggest that the court erred in allowing either to happen without making a Rule 104(b) finding that the threat did, indeed, take place. These arguments are without merit.
 
 
 23
 Federal Rule of Evidence 104(b), which deals with situations where the relevance of a particular piece of evidence is conditioned on another fact, does not govern the issue of whether she should have been allowed to retake the stand. Instead, the operative rule is Federal Rule of Evidence 611. This rule gives the trial judge "reasonable control over the mode and order of interrogating witnesses...." Fed.R.Evid. 611(a). This rule gives the trial judge substantial discretion. Accordingly, in applying the rule, "a judge's ruling will not be the basis for reversal of a criminal conviction unless a defendant's substantial rights are affected." United States v. Terry, 729 F.2d 1063, 1067 (6th Cir.1984). We cannot conclude that the trial court abused its discretion in this case. The court concluded that Trenace Cummings believed that she had been threatened. Regardless of whether Jerome Maddox did in fact threaten her, the subjective belief on Trenace's part could have discomfited her enough to distract her and thereby disrupted her testimony. In any event, the "new and improved version" of her testimony, like many "new and improved" products, differed little from the original. All she did was give some dates regarding events that she had already testified about. Further, had her testimony been significantly different, the jury could have discounted her testimony accordingly.
 
 
 24
 The other question is whether Trenace Cummings should have been allowed to testify that she was threatened. Jerome Maddox argues that the trial court had to make some sort of finding prior to finding that the evidence was admissible, presumably under Rule 104(b). Rule 104(b) addresses the question of "conditional relevancy." By its terms, the rule involves a situation in which "the relevancy of evidence depends upon the fulfillment of a condition of fact...." Fed.R.Evid. 104(b). We have previously held that spoliation evidence, including evidence that the defendant threatened a witness, is generally admissible because it is probative of consciousness of guilt. See United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir.1986). The claim that the district court was required to make a finding that the threat occurred before admitting the evidence is without merit. There is no general rule that a judge must believe evidence to be true prior to allowing evidence in. Rule 104(b) applies only to the situation where the relevancy of evidence depends on the truth of a fact other than the truth of the evidence being introduced. Otherwise, Rule 104(b) would require the trial judge to make factual findings regarding every piece of evidence introduced at trial.[2] In any event, Rule 104(b) does not require that a judge believe a fact upon which the relevancy of evidence depends to be true. Rather, the rule requires that there must be evidence "sufficient to support a finding of the fulfillment of the condition." Fed.R.Evid. 104(b). If it applied, that standard would clearly be satisfied in this case.
 
 IV
 
 25
 The trial judge allowed a police officer, Anthony Koger, to identify Anthony Moore from a photograph seized in a raid of the drug house located at 5105 Laurene. The photograph shows several persons, allegedly including Moore, posing and holding weapons. Moore does not challenge the photograph itself, but argues that Officer Koger should not have been allowed to offer lay opinion testimony to the effect that Moore was the person in the photograph.
 
 
 26
 Moore relies primarily on United States v. Calhoun, 544 F.2d 291 (6th Cir.1976), for the proposition that such testimony is not generally admissible. The government distinguishes Calhoun, relying instead on United States v. Monsour, 893 F.2d 126 (6th Cir.1988). The defendant argues that, by identifying the defendant as a person in a photograph, the witness invaded the province of the jury.
 
 
 27
 We believe that this case is governed by the holding of Monsour rather than Calhoun. Calhoun was a factually unique case, distinct from this case in several key respects. In Calhoun, the government called the defendant's parole officer as a witness for the sole purpose of identifying him from a photograph. Calhoun, 544 F.2d at 293. We held that, under the unique circumstances of the case, the defendant was illegitimately deprived of the right to cross-examine the witness. We reasoned that, if the jury found out about the nature of the relationship between the two of them, the jury could infer that the defendant had a prior criminal record. Thus, because of the preexisting relationship between the two, the defendant would have had to go into highly prejudicial matters in order to explore possible motives that his former parole officer might have had in identifying him. There is, in our case, no indication that Officer Koger had any prior relationship with the defendant that would create the necessity of exploring inadmissible matters. Moreover, in Calhoun we found the fact that the parole officer was called for the exclusive purpose of identifying the defendant to be particularly important. Id. at 294. Here, by contrast, Koger was a typical occurrence witness, called to testify regarding what he saw and did at the police raid.
 
 
 28
 The defendant relies in particular on dicta from Calhoun suggesting that such evidence should generally not be admitted because the jury can judge for itself whether the defendant is, in fact, the person pictured in the photograph. It is necessary, however, to read Calhoun in light of subsequent decisions. In Monsour, we distinguished Calhoun, holding that the trial court did not err by allowing a bank security guard to identify the defendant as being a person in a surveillance photograph from a robbery whom the guard had seen "casing" the bank several days before. Monsour, 893 F.2d at 128-29. In Monsour, we explained that the discussion in Calhoun on which the defendant now relies was not the basis for the decision in that case. Id. at 128. We went on to hold that the testimony was relevant and not prejudicial to the defendant. Id. at 129. We believe that the testimony introduced into our case was similarly both relevant and helpful to the jury.
 
 
 29
 The only reason offered against the admission of the testimony is the ability of the jury to look at the photograph and make up its own mind about the identification. Although the language of Calhoun might lend some support to the defendant's argument, we conclude, in light of Monsour, that this discussion is dicta and therefore is not binding on us. We are not unduly concerned about the prejudicial impact of such lay opinion testimony. To the extent that the defendant's argument is true, the jury can, with photograph in hand, evaluate the credibility of such an identification and disregard the identification if it does not consider the testimony credible.
 
 V
 
 30
 The court allowed some testimony regarding Richard Ford's connection with the Ray-Ray Browning conspiracy, and the extent of that conspiracy. Several defendants have objected to this testimony, arguing that it was irrelevant because it was not related to the Maddox conspiracy, or, alternatively, that the evidence was more prejudicial than probative.
 
 
 31
 Nei Wells, an individual who had been associated with the California-based Ray-Ray Browning conspiracy, testified regarding these activities. She worked for Ray-Ray Browning for approximately two years before being apprehended.[3] She knew of at least two occasions on which persons from the Detroit area picked up cocaine from her for transportation back to Detroit using a grey and black van that turned out to belong to Ford. On another occasion the van came again, and this time Ford was a member of the group. This evidence was relevant to show that Ford purchased cocaine from the Ray-Ray Browning organization. The issue is whether the evidence tying Ford to the Maddox conspiracy was adequate. We think that the evidence was sufficient to tie Ford to the Maddox conspiracy.
 
 
 32
 Several of the defendants object because they were not personally connected with Ford. This misses the point. The point of conspiracy law is to get at joint ventures. Once operations exceed a certain scale, it is highly improbable that all conspirators will know each other. It would be wrong, moreover, to allow conspirators to avoid being tried together by employing the "cell system." Ford was connected to the Maddox organization through Antoine Maddox, the man primarily responsible for supplying cocaine. Twala Jones (a frequent Maddox customer) testified that she saw Ford come to a Maddox drug house in order to see Antoine Maddox. Furthermore, she testified that she saw Ford give Maddox cocaine on three or four separate occasions. Additionally, the manager of the Amy Jo apartments, another location used as a crack house, found in the debris left by the Maddox organization after clearing out an address book containing Ford's telephone number. Finally, there was a certain amount of purely circumstantial evidence connecting Ford with the conspiracy. Antoine supplied the cocaine and Ford was associated only with Antoine. Nobody knew where Antoine got his cocaine, but they did know that the source lived in Detroit. Ford is from Detroit. Taken together, the evidence can form a coherent picture. Accordingly, we hold that there was sufficient evidence tying Ford to the Maddox conspiracy.
 
 
 33
 The defendants maintain, however, that the evidence was more prejudicial than probative, and that it therefore violated Fed.R.Evid. 403. This argument has numerous flaws, and we mention only a few. The evidence of the Ray-Ray Browning conspiracy was pretty tame stuff when compared to the other evidence arrayed against the defendants. It is simply not plausible to believe that the mere mention of large-scale dealings so inflamed the jury as to make it incapable of rendering an objective verdict. In any event, we have previously held that introduction of evidence regarding several distinct transactions can be necessary "to prove the scope of the conspiracy." United States v. Kelley, 849 F.2d 999, 1004 (6th Cir.1988). The government's theory was that the Ray-Ray Browning organization supplied the Maddox organization with cocaine. The evidence introduced regarding the scope of the Ray-Ray Browning conspiracy was relevant because it demonstrated that the Ray-Ray Browning organization had the capacity to supply the Maddox organization with cocaine.
 
 
 34
 Nor was there a fatal variance in proofs. In proving a conspiracy, continuity of location is not required. Rather, the " 'unity essential to a conspiracy is derived from the assent of its members to contribute to a common enterprise.' " Id. at 1003, quoting United States v. Grassi, 616 F.2d 1295, 1303 (5th Cir.), cert. denied, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). In this case, as in Kelley, the goal of the conspirators was the same, regardless of the locations at which the members operated. Id. at 1003. The evidence linking Ford to the conspiracy ties everything together and negates the argument that there was a variance in proofs. The activities in California served the same purpose as those in Michigan: supplying the people of Flint, Michigan with cocaine.
 
 VI
 
 35
 Gaylon Terry argues that his conviction constitutes double jeopardy because the trial judge originally granted his motion for acquittal and then changed his mind after a timely motion for reconsideration. The district court rejected Terry's double jeopardy argument, and so do we. The primary aim of the double jeopardy clause is to prevent a defendant from being tried twice for the same crime. In this case, we deal with a postverdict ruling by the district judge that merely reinstated a jury verdict.
 
 
 36
 There is no question that a postverdict acquittal is appealable by the government and that restoration of the guilty verdict is proper if the government prevails. See United States v. Wilson, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). Thus, there is no question that we could reverse and order that the conviction be reinstated. It follows a fortiori that it would not violate double jeopardy principles for the district court to make the same determination after a timely motion for reconsideration. It would be odd indeed to say that the trial court was precluded, on a motion for reconsideration, from doing what the appellate court clearly has the authority to do. Terry's reliance on United States v. Martin Linen Supply, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977) is misplaced. That case is distinct in that the trial judge entered the verdict of acquittal after trial had resulted in a hung jury. Id. at 571-73, 97 S.Ct. at 1354-56. Thus, in that case, the trial court's reversal of its earlier ruling would have necessitated a new trial, whereas here it does not.
 
 VII
 
 37
 Ronald Arnold maintains that there was insufficient evidence to convict him of participating in the conspiracy after his eighteenth birthday. We have held, following the Eleventh Circuit, that one who enters a conspiracy prior to his eighteenth birthday can be tried as an adult if he continues in the conspiracy after that time. United States v. Gjonaj, 861 F.2d 143, 144 (6th Cir.1988). The government maintains that the burden was on Arnold to take an affirmative step to withdraw from the conspiracy prior to his eighteenth birthday. We think that this pushes a bit beyond the outer bounds of our decision in Gjonaj. In that case, we reasoned that conspiracy is a continuing offense. Id. at 143. Accordingly, a conspirator commits the crime each day that he remains a member of the conspiracy. Thus, an eighteen-year-old who continues to participate in a conspiracy after his eighteenth birthday commits an act in violation of law after his birthday. We do not believe, however, that a person who does absolutely nothing to further the conspiracy or to reaffirm membership in it after his eighteenth birthday can be held criminally liable as an adult in federal court. In Gjonaj, we noted that "the Eleventh Circuit has held that since conspiracy is a continuing crime, a defendant who entered a conspiracy while under eighteen may be tried as an adult upon a 'threshold demonstration of post-eighteen conspiracy activity.' " Id. at 144, quoting United States v. Cruz, 805 F.2d 1464, 1476 (11th Cir.1986), cert. denied, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987). We agree.
 
 
 38
 This is somewhat analogous to the concept of ratification in contract law. An "infant" cannot enter a contract prior to the age of majority, but an infant can be held liable if he acts to ratify the contract, either explicitly or implicitly. See Generally, J. Calamari & J. Perillo, Contracts § 8-4 (3d ed. 1987). We reject the rule suggested by the government because it would, in effect, punish a person for an act--the agreement to join the conspiracy--committed prior to the defendant's eighteenth birthday. Accordingly, we now hold that the government must make a threshold demonstration that the defendant who joined a conspiracy prior to his eighteenth birthday "ratified" his membership in that conspiracy after his eighteenth birthday. He cannot be held liable for pre-eighteen conduct, but such conduct can, of course, be relevant to put post-eighteen actions in proper context.
 
 
 39
 We think that the government has in fact made such showing in this case. It is absolutely clear that Arnold sold drugs for the Maddox organization prior to his eighteenth birthday. Arnold claims, however, that he quit selling drugs prior to his eighteenth birthday. Arnold turned eighteen on February 17, 1988. Twala Jones testified that she saw him at various drug houses, including at the Sussex and 5409 Kermit drug houses in 1988. She did not move into the Sussex apartment used as a drug house until on or after the day Arnold turned eighteen. Her testimony was corroborated by Dawn Lovett, who testified that she saw him eight or nine times at the 5409 Kermit drug house during the year 1988. Ternace Cummingham also testified that she saw him selling drugs in the summer of 1988 at a location on Glenn Street. She remembered this day in particular because he tore her shirt off that day. It is, of course, possible that all of the sightings took place prior to February 17, but taken as a whole, the evidence overwhelmingly supports the inference that he sold cocaine after his birthday. This is supported by another, final, piece of evidence. After his eighteenth birthday, Arnold happened upon Lionel Keener and told him that he was "still rolling"--meaning that he was still selling cocaine. This evidence was more than sufficient for the jury to conclude that Arnold had participated in the Maddox conspiracy after his eighteenth birthday.
 
 VIII
 
 40
 Finally, we address a search-related issue. Antoine Maddox wants to challenge the search of Shirlenia Rutherford's residence (which doubled as a crack house) located at 424 W. Marengo, which took place on October 24, 1986 pursuant to a search warrant. In that search, the police found a quantity of cocaine on the kitchen table. Several defendants, including Antoine Maddox, were in the residence. This evidence was introduced at trial. The government maintains that Antoine Maddox lacks "standing" to challenge the search of her residence. We have not always been as clear as possible on this issue, see, e.g., United States v. Adamo, 742 F.2d 927, 947 (6th Cir.1984), so we can excuse the government's apparent confusion. The Supreme Court has made it clear that the issue of standing collapses into the merits in fourth amendment cases. See Rakas v. Illinois, 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978). As the Court succinctly explained in a later case, Rakas "abandoned a separate inquiry into a defendant's 'standing' to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched." Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). Thus, if a court concludes that a defendant has no reasonable expectation of privacy, that defendant loses on the merits, and it adds nothing to say that the defendant had "no standing."
 
 
 41
 Turning to the merits then, there is little doubt on this issue, Our precedent, though terminologically somewhat confused, makes it abundantly clear that, after Rakas, a guest at a party does not have a reasonable expectation of privacy in items found in the house at which the party occurs. Adamo, 742 F.2d at 947-48. The evidence shows only that Maddox was a guest at Rutherford's house during a drug party. Maddox tries to bootstrap himself into having a reasonable expectation of privacy in the Rutherford home by relying on the fact that his person was searched. The evidence seized in the search of his person was, however, not introduced at trial. That Maddox retains, almost wherever he goes, a legitimate expectation of privacy in his person does not give him an expectation of privacy with respect to the contents of a building within which he is present. In effect, Maddox would have us revive the "legitimately on the premises" standard rejected by the Supreme Court in Rakas. Rakas, 439 U.S. at 143, 99 S.Ct. at 430. We have neither the authority nor the inclination to do this. Maddox did not live in the Rutherford home, or have any property interest in it. Nor does the Supreme Court's more recent decision in Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), undermine our precedent. In that case, the Court held that an overnight guest does have a legitimate expectation of privacy in the house at which he is a visitor. Id. 110 S.Ct. at 1688. Nothing in this record indicates that Maddox was anything other than a purely transient party guest. Accordingly, he had no reasonable expectation of privacy in items found scattered throughout Rutherford's apartment.[4]
 
 IX
 
 42
 The rest of the defendants' arguments are without merit. The defendants' convictions and sentences are
 
 
 43
 AFFIRMED.
 
 
 
 *
 The amending order is published at 12 F.3d 599
 
 
 [1]
 During the course of the robbery, Johnson physically attacked Twala Jones's mother in what was apparently a rather brutal fashion. Johnson received a long sentence in state court for this offense. Although the government wished to introduce all of the gory details, the trial judge wisely kept the government from doing so
 
 
 [2]
 Kenneth Johnson makes a number of challenges to the evidence that seek to discredit the witness or to demonstrate possible inconsistencies in the evidence. He is making his arguments in the wrong forum. It was for the jury to decide whether to believe the evidence and to assess the weight, if any, to accord the evidence if believed
 
 
 [3]
 Her testimony resulted from an agreement to cooperate
 
 
 [4]
 He did, of course, retain his preexisting expectation of privacy in his person and his personal property, even within the confines of another's apartment