**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-1444

_____

UNITED STATES OF AMERICA

v.

CHE ROSE,
                                   Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 3:10-cr-025)
District Judge:  Hon. Kim R. Gibson

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 2, 2015

Before:  FISHER, JORDAN, and SHWARTZ, *Circuit Judges*.

(Opinion Filed:  June 3, 2015)

_____

OPINION*

_____

JORDAN, *Circuit Judge*.

    Che Rose appeals an order of the United States District Court for the Western

District of Pennsylvania denying his motion to suppress the fruits of a search of Brandon

Grayson's apartment.  He argues that, as Grayson's social guest, he had a legitimate

_____

    * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

expectation of privacy in Grayson's apartment, and, as a result, he has standing to challenge the search. His argument is unpersuasive and we will affirm.

## I.     Background

### A.     Factual Background

On September 10, 2009, Detective Larry Wagner was investigating a recent burglary in which a .40 caliber handgun had been stolen. J.M., a juvenile residing at the Cambria County Juvenile Detention Home, told Detective Wagner that another juvenile, A.P., claimed to have sold the firearm to an older black man for $300. J.M. was not present when A.P. sold the gun; in fact, J.M. never saw A.P. possess the firearm. J.M. said that the sale took place at an apartment on the top floor of a building located on Cypress Avenue in Johnstown, Pennsylvania, across from the old Cypress Avenue School. More specifically, the address was 340 Cypress Avenue, Apartment 6 ("Apartment 6"). J.M. knew the location because he had accompanied A.P. to Apartment 6 after the sale when, for unexplained reasons, A.P. attempted to retrieve the firearm.

Detective Wagner spoke with other juveniles who corroborated a part of J.M.'s information, though they could not confirm the location of the sale. Detective Wagner spoke to A.P., who admitted handling the firearm but did not admit to possessing it for any length of time. A.P. also denied selling the gun to anyone.

Within hours of interviewing J.M., Detective Wagner decided to go to Apartment 6. Because he believed that the matter presented issues of officer safety, he took three other officers along: Detective Eckenrod, Officer Britton, and Officer Kabler. Also, because he was concerned about the passage of time and the possibility of the firearm

2

being moved, Detective Wagner did not obtain a search warrant. Instead, he hoped to meet with the occupant, explain the information that he had gathered, and receive consent to search the apartment.

When they arrived at Apartment 6, Officer Kabler walked to the rear of the apartment building and Detective Wagner knocked on the front door of Apartment 6. Grayson opened the door. At the time, Grayson, who was renting the apartment, had resided there for a little over a year, but he spent most nights at his fiancée's apartment. After spending the night of September 9, 2009, at his fiancée's apartment, Grayson returned to Apartment 6 sometime between 9 a.m. and 10 a.m. on the morning of September 10 to prepare for a cookout he was hosting that day. About one hour later, Grayson's brother and his brother's girlfriend arrived along with her child. Shortly thereafter, others arrived, including Rose.

Rose was a casual acquaintance of Grayson's, but he was a good friend of Grayson's brother. Although Grayson had known Rose for approximately six years, the two seldom spent time together. Rose had stayed the night at Grayson's residence at least once when Grayson lived at a different address, but Rose had never been an overnight guest at Apartment 6.

After Grayson opened his apartment door, Detective Wagner identified himself, explained that he was investigating a firearm burglary, and asked for permission to search the apartment for the firearm. Grayson did not consent and told the officers that they would need to secure a search warrant if they wished to search his apartment. Detective Wagner responded that he would seek a search warrant, but in the interest of officer

3

safety and to prevent the destruction or removal of evidence, the officers needed to secure the apartment. After receiving that explanation, Grayson stepped out of the way and the officers entered Apartment 6.

At about the same time the officers were entering Grayson's apartment, Officer Kabler, who was behind the apartment building, heard a window being opened. He looked up and saw Rose leaning out of a window with a revolver in his hand. Officer Kabler radioed to the other officers that there was a person with a gun hanging from one of the windows of the apartment. He then ordered Rose to drop the gun, but Rose did not comply and instead unsuccessfully attempted to throw the gun onto the roof. It landed on the ground instead. Detectives Eckenrod and Wagner then entered the room where Rose was hanging out of the window. Without any prompting from the officers, Rose proclaimed that the gun was his, nobody else's, and nobody else was involved. The officers arrested Rose and seized the .38 caliber revolver he had tried to hide, along with money and crack cocaine concealed on his person.

After obtaining a warrant, the police searched Apartment 6 but did not locate the stolen .40 caliber firearm for which they had come.

### B. Procedural History

A grand jury returned an indictment charging Rose with distribution of less than 5 grams of crack cocaine on June 19, 2009, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (count 1); unlawful possession of a firearm by a felon on September 10, 2009, in violation of 18 U.S.C. § 922(g)(1) (count 2); possession with intent to distribute less than 5 grams of crack cocaine on September 10, 2009, in violation of 21 U.S.C.

4

§§ 841(a)(1) and 841(b)(1)(C) (count 3); and distribution of less than 5 grams of crack cocaine on April 13, 2010, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (count 4).

Rose moved to suppress the evidence that was seized on September 10, 2009, and that provided the basis for counts 2 and 3. In his motion, he argued that his statements and the physical evidence were products of a warrantless search of Grayson's apartment, which was made without probable cause or exigent circumstances. Rose claimed that he was an overnight guest at Grayson's apartment and therefore had standing to challenge the legality of the search. The District Court held a hearing to consider his motion, but Rose presented no evidence to support his assertion that he had been an overnight guest. The District Court denied the motion, finding that, as a short-term social guest, Rose did not have standing to challenge the search of Grayson's apartment.

Rose pled guilty to counts 2 and 3, but he reserved the right to appeal the denial of his suppression motion, which he has now done.

## II.    Discussion[1]

To have standing to challenge the search of Grayson's apartment, Rose must establish that he had a reasonable expectation of privacy in the apartment. *Minnesota v. Olson*, 495 U.S. 91, 95-97 (1990). That requires him to show both that he had a subjective expectation of privacy in the apartment and that his expectation was

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. On appeal from the denial of a motion to suppress, we review the District Court's factual findings for clear error and exercise plenary review over its legal determinations. *United States v. Stanley*, 753 F.3d 114, 118 (3d Cir. 2014).

objectively reasonable. *Rakas v. Illinois*, 439 U.S. 128, 143 & n.12 (1978); *United States v. Donahue*, 764 F.3d 293, 298-99 (3d Cir. 2014). As the Supreme Court has explained, a person who lacks the requisite expectation of privacy and is "aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134.

On appeal, Rose abandons the argument he made in the District Court that he was an overnight guest and argues instead that, because he was Grayson's social guest and had a "pre-existing relationship" with Grayson, he should be recognized as having a legitimate expectation of privacy in Grayson's apartment and, consequently, having standing to challenge the search of the apartment. (Opening Br. at 14; *see also* Opening Br. at 27 ("As a social guest present with his host's permission to enjoy a cook out and to hang out, Che Rose had a reasonable expectation of privacy in the home of his host and long-time acquaintance, Brandon Grayson.").) Rose argues that *Minnesota v. Olson* supports his position. In *Olson*, the police made a warrantless, nonconsensual entry into a house where Robert Olson was an overnight guest and arrested him. The Supreme Court held that the arrest violated Olson's Fourth Amendment rights. In reaching its conclusion, the *Olson* Court reasoned that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society" and "society recognizes that a houseguest has a legitimate expectation of privacy in his host's home." 495 U.S. at 98. The Supreme Court's analysis was also informed by its observation that an overnight guest "seeks shelter in another's home precisely because it

6

provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id*. at 99.

Rose contends that the holding in *Olson* is not limited to overnight guests and that the principles articulated in the case are broad enough to cover a social guest attending an afternoon cookout at the home of a long-time acquaintance and friend. In support of that contention, Rose reasons that, "despite [*Olson*'s] emphasis upon the special privacy concerns of guests when they are asleep and cannot monitor their own safety or the security of their belongings, that consideration seems largely irrelevant in the *Olson* case itself, where the objected-to police conduct occurred at three o'clock in the afternoon." (Opening Br. at 22 (internal quotation marks and brackets omitted).) Rose also says that "visiting the house of another without an overnight stay is [also] a longstanding social custom that serves functions recognized as valuable by society." (*Id*. at 22-23 (emphasis and internal quotation marks omitted).)

Whether or not Fourth Amendment protections may be broad enough to cover individuals other than residents and their overnight guests, the expansive rule for which Rose advocates goes too far.[2] In *Jones v. United States*, 362 U.S. 257 (1960) *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980), the Supreme Court held that a defendant who was arrested at his friend's apartment during the execution of a

---

[2] Rose asserts that, looking at the concurrences and dissent filed in *Minnesota v. Carter*, 525 U.S. 83 (1998), we can surmise that five Justices accept the proposition that almost all social guests have a legitimate expectation of privacy, and therefore protection against unreasonable searches, when in their host's home. (Opening Br. at 26.) Rose makes a clever argument, but we need not engage in the reading of tea leaves given the Supreme Court's clear guidance in *Rakas v. Illinois*, discussed herein.

7

search warrant could challenge the search of the apartment because he was "legitimately on [the] premises." *Id*. at 267. In *Rakas v. Illinois*, however, the Supreme Court rejected *Jones*'s "legitimately on [the] premises" standard as overly broad. 439 U.S. at 142-48. While *Rakas* reaffirmed the factual holding in *Jones*, stating that "*Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place," *Rakas* recognized that, as an overnight guest, Jones was much more than just "legitimately on [the] premises." 439 U.S. at 141-42. *Olson* later adhered to the reasoning in *Rakas*, holding that the defendant had standing to challenge a search because he was an overnight guest. 495 U.S. at 98-100. "Thus, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).

The rule for which Rose argues is only slightly narrower than the "legitimately on [the] premises" standard that was rejected in *Rakas*. Perhaps in the future, it may be necessary for us to decide whether Fourth Amendment rights attach somewhere on the spectrum between "overnight guest" and "merely present with the consent of the householder." We need not do so now, however, because, as ample precedent demonstrates, this case does not present a close call. Rose had no possessory interest in any part of the apartment, *United States v. Maddox*, 944 F.2d 1223, 1234 (6th Cir. 1991); he did not store any clothing or property at the apartment, *cf. United States v. Armenta*, 69 F.3d 304, 308-09 (9th Cir. 1995); he had no key to the apartment, *cf. United States v.*

8

*Davis*, 932 F.2d 752, 757 (9th Cir. 1991); *United States v. Nabors*, 761 F.2d 465, 469 (8th Cir. 1985); he did not have permission to be at the apartment without Grayson's presence or consent, *cf. Davis*, 932 F.2d at 757; *Nabors*, 761 F.2d at 469; he did not receive mail at the apartment, *cf. Nabors*, 761 F.2d at 469; five other guests had common access to the areas in the apartment occupied by him, *cf. United States v. Ruiz*, 664 F.3d 833, 839 (10th Cir. 2012); *United States v. Correa*, 653 F.3d 187, 190-91 (3d Cir. 2011); *United States v. Maestas*, 639 F.3d 1032, 1039-40 (10th Cir. 2011); he had no ability to and made no effort to exclude others from any part of the apartment, *cf. Gray*, 491 F.3d at 152; he was a casual acquaintance of Grayson's, *cf. Maddox*, 944 F.2d at 1234; and, because no evidence was elicited at the suppression hearing suggesting that Rose had ever even visited Apartment 6 before the search, he was, it seems, an infrequent visitor to the apartment, *cf. United States v. Pollard*, 215 F.3d 643, 647-48 (6th Cir. 2000); *Maddox*, 944 F.2d at 1234. On this record, then, the District Court properly found that Rose lacked standing to challenge the search of Grayson's apartment.[3]

## III. Conclusion

For the foregoing reasons, we will affirm the District Court's denial of Rose's motion to suppress.

---

[3] Because we agree with the District Court that Rose lacks standing to challenge the search of Grayson's apartment, we need not address his remaining arguments concerning the search.