NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0605n.06
Filed: July 18, 2005

Nos. 04-5334/04-5335

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

WILLARD SMITH and
DONNIE NEWSOME,

     Defendants-Appellants.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY

BEFORE:    CLAY and SUTTON, Circuit Judges; O'MEARA, District Judge.[*]

    **CLAY, Circuit Judge.** Defendants Willard Smith and Donnie Newsome appeal their convictions and sentences for vote buying and conspiracy to buy votes in violation of 18 U.S.C. §§ 2, 371 and 42 U.S.C. § 1973i(c). For the reasons that follow, we **AFFIRM** both Defendants' convictions; however, we **VACATE** Smith's sentence and remand for resentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

## I.   BACKGROUND

    In 1998, Donnie Newsome, then a Kentucky state representative, decided to run for Knott County Judge Executive. In approximately March 1998, Newsome had a conversation about his

_____

[*]The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

campaign with an individual named Keith Pigman. Newsome asked Pigman to purchase votes for him and two other candidates in the 1998 election, Robert Short, who was running for county clerk, and Randy Slone, who was seeking the office of county attorney. In return for Pigman's assistance, Newsome promised that if he won the election, he would hire Pigman for a job with the Knott County Fiscal Court. Newsome also hired Newton Johnson to assist in the vote buying scheme, promising that if elected, he would make sure that the county fixed the unpaved road leading into the hollow where Johnson resided.

A primary election was held in May 1998, with voters choosing candidates for, among other offices, Knott County Judge Executive and United States Senator. In the weeks leading up to the primary, Pigman, Smith, and several others worked together to buy votes for Newsome. At Newsome and Smith's trial, a number of witnesses, including Pigman and Johnson, testified that they either sold their votes to Newsome and his associates, or directly assisted in the vote buying scheme. For example, Jackie Darrell Slone and his cousin Denzil Slone both testified that Smith and Pigman approached them on the street and offered them $50 apiece for their votes. Jackie Darrell and Denzil agreed, and Pigman accompanied them into the courthouse to fill out absentee ballots. The cousins told the clerk that each was illiterate and needed Pigman to accompany them into the voting booth.[1] Once inside the booth, Pigman voted each man's ballot for him. Similarly, Johnson testified that he was enlisted to procure the votes of his sister, two nieces and nephew-in-law. Johnson drove these four relatives to the courthouse so that they could vote by absentee ballot, for which each was paid $50. In addition, Smith's first cousin, Mary Baum, testified that Smith brought

---

[1]Jackie Darrell testified that he is actually illiterate, but Denzil is not.

her to the courthouse to vote via absentee ballot, and gave her $60 after she had voted. Another man, Ralph Hicks, Jr., testified that he and his brother were walking past the courthouse prior to election day, and Smith called out to them and asked them to come over. Smith then offered Hicks and his brother $50 each to fill out an absentee ballot and vote for Newsome, which they agreed to do. Finally, Donald Ray Thomas testified that Newsome personally paid him $100 after he voted by absentee ballot in the 1998 primary election.

In addition to paying people to vote by absentee ballot, on the actual primary day, Newsome instructed Johnson to drive people to the polls. After Johnson brought them to the polls to vote, Smith, who was stationed at a polling place, would pay them for their votes. Johnson testified that he believed Smith had around $5,000 to pass out on election day, and that the money ran out before the day was over. Johnson also testified that Newsome had other individuals scattered at other polling places passing out money for votes. In addition, Kali Holbrook and Smith's nephew, Paul Shannon Johnson, testified that when they went to vote on election day, Smith and Pigman approached them and offered to give them each $10 and beer to vote for Newsome. However, Holbrook and Paul Shannon declined, as each had already been paid $50 to vote for Newsome's opponent, incumbent Knott County Judge Executive Homer Sawyer.[2]

Following the 1998 primary, the local media reported that an inordinate number of absentee ballots had been cast in Knott County, and anonymous tips and a call from the Kentucky Registry

---

[2]Apparently, corruption was rampant during the May 1998 Knott County primary election. We have recently had occasion to address the same election in two other criminal vote-buying cases, one of which involved a defendant convicted of purchasing votes on behalf of Homer Sawyer. *See United States v. Slone*, ---F.3d----, 2005 WL 1384364 at *1 (6th Cir. Jun. 3, 2005); *United States v. Madden*, 403 F.3d 347 (6th Cir. 2005).

of Election Finance led the FBI to investigate the election. Subpoenaed voting records disclosed a number of red flags, including the same names on voter assistance forms and voters with addresses in close proximity to each other voting on the same day. Based on these records, the FBI began approaching individual voters, who were promised immunity for their cooperation in the investigation.

Following the FBI's investigation of the 1998 primary, a grand jury handed down a six-count indictment against Smith, Newsome and Pigman, charging that: (1) Smith, Newsome and Pigman conspired to "knowingly and willfully pay and offer to pay voters for voting in the [May 26,1998] primary election, in violation of 42 U.S.C. § 1973i(c)"; (2) Newsome paid and offered to pay Donald Ray Thomas for voting in the 1998 primary election, in violation of § 1973i(c) and 18 U.S.C. § 2; (3) Smith paid and offered to pay Ralph Hicks, Jr. for voting in the 1998 primary election in violation of § 1973i(c); (4) Smith, Newsome and Pigman paid and offered to pay Denzil Slone, Jr. to vote in the 1998 primary election in violation of § 1973i(c) and § 2; (5) Smith and Pigman paid and offered to pay Jackie Darrell Slone to vote in the 1998 primary election in violation of § 1973i(c) and § 2; and (6) Smith paid and offered to pay Mary Baum to vote in the 1998 primary election in violation of § 1973i(c). *Id.* at 48-53. Although each Defendant pleaded not guilty, Pigman later changed his plea to guilty. *Id.* at 648-50. In exchange, the government dismissed Counts 4 and 5 against Pigman, and he agreed to testify against Newsome and Smith. *Id.* at 650.

During Defendants' trial, in addition to the above testimony regarding vote buying, evidence was introduced that two witnesses had been threatened. Donald Ray Thomas testified before the

grand jury that he sold his vote to Newsome; however, when he was called to the stand at trial he initially claimed that he did not remember anything about vote buying, the 1998 primary election or his grand jury testimony. Outside of the jury's presence, the trial court advised Thomas that he would be held in contempt if he failed to answer questions, and ordered a $10,000 bond to force Thomas to reappear the following day to resume his testimony. The next day, Thomas was a cooperative witness. He first testified that he claimed lapsed memory the previous day because "There was some people talking to me and trying to scare me and I didn't want to say nothing." Thomas also testified that these unidentified persons told him "That I was a walking dead man and that I wouldn't be able to live on Beaver where I live at and everything else after this was over." Furthermore, Thomas relayed that shortly after he received these warnings, Newsome's son-in-law, Jeff Little, telephoned him around 10:30 or 11:00 at night and asked to meet him at "Tater Branch," an isolated hollow near Thomas' residence, so that they could "talk." Thomas testified that he "wasn't going up there for nothing in the world," due to the recent warnings and the time of night at which he received Little's call. Thomas conceded, however, that neither Newsome nor Smith had personally threatened him.

In addition to Thomas' testimony, Shelia Fugate, a woman who claimed that she sold her vote to Newsome for $50 in the 2002 primary election, testified that after her name appeared on a sealed witness list for Defendants' trial, a man named Kermit Short approached her on the courthouse steps and told her not to testify. Fugate also testified that several days prior to appearing in court, Kermit Short came to her house and again told her not to testify against Newsome or the state police would be after her and her family. Short also said to Fugate, "You know who governs

the county, don't you," which Fugate understood to refer to Newsome, the County Judge Executive. Fugate further testified that Short told her he saw her name on a list of witnesses as "Shelia Combs." Fugate's common law husband, Charles Combs, then testified that he came home to find Short speaking with Fugate, and that after Short left, Fugate was "all nerves" and "was extremely upset." Combs also testified that he sold his vote to Newsome in the 2002 primary for $50, and that Newsome gave him an additional $50 for bringing Fugate in to vote.

Kermit Short is the brother of Robert Short, who ran for county clerk in 1998 on the same slate of candidates as Newsome. His sister-in-law, Joe Short, also worked for Newsome on the Knott County Fiscal Court. Additionally, it was adduced at trial that Shelia Fugate's name appeared incorrectly on the trial witness list as Shelia Combs. The witness list was under seal; however, prior to trial the defense successfully moved to have a copy of the list provided to a defense investigator, Joey Stidham. After Fugate testified, Short took the stand and admitted that he spoke to Stidham several days before he allegedly threatened Fugate, but he denied being given the witness list by Stidham. Short also admitted going to Fugate's house prior to the trial, but he denied speaking with her about her testimony or threatening her in any way.

At the close of the evidence, the jury convicted Smith and Newsome on all counts. Defendants now raise several challenges to their convictions and sentences.

## II. DISCUSSION

### A. Severance

After Fugate and Charles Combs testified, Smith's attorney moved for severance, claiming that there was no evidence that Smith participated in vote buying in the 2002 election, or that he had

anything to do with the threat against Fugate. The district court denied Smith's motion, finding that the threat evidence was admissible against both Defendants through the conspiracy. The court then gave a limiting instruction on the 2002 primary evidence, instructing the jury to only consider that evidence against Newsome. On appeal, Smith challenges the district court's denial of his motion for severance.

We review the denial of a severance motion for an abuse of discretion. *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). "In order to prevail on a motion for severance, a defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever." *Id.*; *cf. United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985) ("Absent a showing of substantial prejudice, spillover of evidence from one case to another does not require severance."). Because Smith has failed to present any evidence of prejudice, we find that his claim is without merit. We have previously held that "a defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him." *United States v. Causey*, 834 F.2d 1277, 1288 (6th Cir. 1987). Additionally, a defendant is not entitled to severance even if an acquittal would be more likely if he were tried alone. *United States v. Beverly*, 369 F.3d 516, 534 (6th Cir. 2004). Furthermore, even assuming *arguendo* that the threat evidence was improperly admitted against Smith, due to the overwhelming evidence of his guilt in the vote buying conspiracy, any error was harmless. *See United States v. Frost*, 125 F.3d 346, 390-91 (6th Cir. 1997). Therefore, the district court did not abuse its discretion in denying Smith's motion for severance.

**B.     Admissibility of Threat Evidence**

Both Smith and Newsome argue that the district court committed reversible error by admitting Fugate's and Thomas' threat testimony under Fed. R. Evid. Rule 404(b). We employ a three-part standard of review for examining the district court's decision to admit evidence of "other crimes, wrongs, or acts" under Rule 404(b), *see United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996), however, the district court's decision to admit testimony not subject to Rule 404(b) is reviewed for an abuse of discretion, *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993). "An abuse of discretion occurs when the lower court relies on clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *United States v. True*, 250 F.3d 410, 422 n.9 (6th Cir. 2001); *see also United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003) ("A district court likewise abuses its discretion when we are firmly convinced that the trial court committed a clear error of judgment.") (quotation and citation omitted).

1.    Fugate

We disagree with Defendants' claim that the threat evidence presented by Fugate is subject to Rule 404(b). "[S]poliation evidence, including evidence that defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt," and "[b]ecause spoliation evidence tends to establish consciousness of guilt without any inference as to the character of the spoliator, its admission does not violate Rule 404(b)." *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986); *see also*, *United States v. Copeland*, 321 F.3d 582, 598 (6th Cir. 2003) (citing *United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993)) ("[E]vidence that has the tendency to demonstrate a defendant's consciousness of wrongdoing is admissible to establish the defendant's guilt."). Further, because such evidence is not subject to Rule 404(b), it is also unnecessary for the

district court to determine whether the threat actually occurred. *See United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991) ("The claim that the district court was required to make a finding that the threat occurred before admitting the evidence is without merit. There is no general rule that a judge must believe evidence to be true prior to allowing evidence in."). Thus, so long as the probative value of such threats is not substantially outweighed by its prejudicial effect, evidence of threats against witnesses is generally admissible. *Copeland*, 321 F.3d at 597.

We find that the district court did not abuse its discretion in allowing Fugate to testify that she was threatened by Kermit Short. There is evidence from which the district court could have imputed Short's threats to Defendants, most notably: (1) defense investigator Stidham obtained a copy of the witness list, which had Fugate's name as Shelia Combs; (2) Stidham then met with Short; and (3) a few days later Short threatened Fugate and told her that he saw her name on a list as Shelia Combs. Additionally, there is the fact that Short's brother ran on a slate of candidates with Newsome in 1998, and Short's sister-in-law worked for Newsome. Based on this evidence, we cannot say that the district court abused its discretion in admitting the Fugate's threat testimony.

### 2. Thomas

We also find that the district court did not err in allowing Thomas to testify that he was threatened. Neither Defendant objected to Thomas' testimony at trial, therefore we review the issue for plain error, *see United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004), and we may only reverse if we find that there is (1) an error, (2) that is plain, (3) that affected Defendants' substantial rights and (4) that the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings," *Johnson v. United States*, 520 U.S. 461, 466-67 (1997).

Neither Defendant attempts to explain to us how the admission of Thomas' threat testimony constituted plain error. However, we note that we have previously upheld, under an abuse of discretion standard, the admission of a witness' testimony that she was subjected to general threats as explanation for earlier inconsistent testimony. *See Maddox*, *supra*, 944 F.2d at 1229-30. In *Maddox*, during a sidebar conference while the witness was on the stand, the defendant allegedly mouthed "you're dead" to her, which affected the witness' composure and testimony. *Id.* at 1226. After a hearing out of the presence of the jury, the district court allowed the witness to testify again, and to tell the jury that she was distracted during her first testimony because the defendant threatened her. *Id.* at 1230. This Court found that the district court did not abuse its discretion by allowing the witness to re-testify: "The court concluded that [the witness] *believed* that she had been threatened. Regardless of whether [the defendant] did *in fact* threaten her, the subjective belief on [her] part could have discomfited her enough to distract her and thereby disrupted her testimony." *Id.* (emphasis in original). Similarly, in the instant case, the district court did not abuse its discretion by allowing Thomas to testify that he was threatened as an explanation for his initial lack of memory and cooperation on the witness stand. In light of *Maddox*, the admission of Thomas' testimony was not a plain error that would entitle Defendants to a reversal of their convictions.

## C. Testimony Regarding the FBI's Investigation

Both Defendants contend that the district court erred in allowing an FBI agent to testify that the government's investigation in the instant case was ongoing. Defendants failed to object to the agent's testimony at trial, therefore we review for plain error. *See Johnson*, *supra*, 520 U.S. at 467; *Cromer*, *supra*, 389 F.3d at 672.

Special Agent Timothy Johnson testified at trial about the process that the FBI used to investigate this case. Defendants specifically complain about the following exchange between Agent Johnson and the prosecutor:

Q:      Tim, as you've heard, there's been testimony that there was 1,020 absentee ballots cast in this election. Did you try to interview all 1,020 people?

A:      No, sir. It would have been physically impossible at least for the number of agents that were available for the case.
        ...

Q:      Tim, do you know how many voters were interviewed during the course of this investigation?

A:      I don't have a solid number. There's numbers assigned to the interview. Some people were interviewed twice. I would say in the neighborhood of 200 people.

Q:      And is this investigation still ongoing?

A:      In a limited since (sic), yes, sir.

Q:      The election was five years ago. The statute of limitations has expired with five years; is that correct?

A:      That's correct.

Q:      But the investigation is still ongoing as directed by this Court?

A:      That's correct.

Joint Appendix ("J.A.") at 535-36. Defendants argue that the above testimony "clearly suggested to the jury that the Judge thought there were threats being made against witnesses by the Defendants and had ordered an investigation by the FBI."

Defendants' argument is wholly without merit. Agent Johnson was not asked, nor did he testify, that the district court had ordered an investigation into threats against witnesses by Defendants. The above testimony is about the FBI's investigation into vote fraud and absentee ballots in the 1998 election generally, and the ongoing investigation referenced is not linked to Defendants. Immediately after the quoted testimony, the prosecutor asked Agent Johnson about the unrelated matter of the contents of an immunity letter that he provided to vote sellers. We find no error in the district court's allowance of this testimony, let alone a plain error that would cause us to reverse Defendants' convictions.

## D.      Limitation of Cross-Examination on Character Issues

Defendant Smith argues that the district court erred by not allowing his counsel to cross-examine Newton Johnson about the fact that Johnson tested positive for marijuana while out on bond on another case, or Charles Combs about the fact that Combs was on probation for an unrelated crime. Smith's argument to this Court in this regard barely covers one page of his appellate brief, fails to cite any relevant legal authority for his position, and fails to develop how he was prejudiced by the district court's failure to allow cross-examination on Johnson's and Combs' unrelated criminal transgressions. In light of the fact that this Court has repeatedly held that "'issues adverted to [on appeal] in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,'" we decline to address the merits of Smith's argument. *United States v. Demjanjuk*, 367 F.3d 623, 638 (6th Cir. 2004) (quoting *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001); *see also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not

sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quotation and citations omitted).

## E. Testimony by Additional Government Witnesses

Smith also claims that the district court committed reversible error by allowing several witnesses whose individual vote sales were not directly charged in the indictment to testify at trial. Smith argues that because the indictment does not specify that Defendants bought or offered to buy the votes of trial witnesses Josephine Slone, Paul Shannon Johnson and Kali Holbrook, these witnesses were subject to the requirements of Fed. R. Evid. 404(b), including a specific identification of the purpose of their testimony by the government and a limiting instruction from the court. We review the district court's decision to allow testimony for an abuse of discretion. *Bonds*, *supra*, 12 F.3d at 554.

Smith's argument is completely frivolous. Slone, Johnson and Holbrook provided *direct evidence* of the existence of a conspiracy between Defendants to purchase votes in the 1998 primary election, as charged in Count 1 of the indictment. Each of these witnesses testified that he or she was approached by a member of the conspiracy and offered money for his or her vote. Clearly, these witnesses were not proffering evidence of "other acts" under Rule 404(b). Therefore, the district court did not abuse its discretion in admitting their testimony without a statement of the purpose for which the testimony was offered and a limiting instruction.[3]

---

[3]Smith raises several other claims of error by the district court, including: an argument that the cross-examination of Kermit Short and Newsome compounded the prejudice associated with the threat evidence (which Smith avers "was as serious as a heart attack for the Defendants"); a claim that the jury should have been informed that Denzil Slone was in the county jail on an unrelated assault charge when he was interviewed by the FBI in connection with selling his vote; and an

**F.      Sentencing**

Both Defendants raised sentencing claims in their briefs to this Court, however, at oral argument Newsome's counsel informed us that his client has been released from prison.  Therefore, Newsome's challenges to the district court's sentencing decision are moot, *United States v. Namey*, 364 F.3d 843, 844 n.1 (6th Cir. 2004); *United States v. Delgado*, 350 F.3d 520, 524 n.4 (6th Cir. 2003), and we need only address Smith's sentencing claims.

Smith first argues that the district court erred in enhancing his sentence based on a finding that the vote sellers constituted "vulnerable victims" under the Sentencing Guidelines.  Section 3A1.1(b)(1) of the Guidelines provides, "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels."  A vulnerable victim is defined as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct." *See* U.S.S.G. § 3A1.1, cmt. n.2 (2003).  The district court noted that some of the vote sellers were mentally handicapped, and therefore applied the enhancement.  However, in another of our recent vote buying cases, we addressed this exact issue and held that individuals who sell their votes are not "victims" for the purposes of § 3A1.1. *See Madden*, 403 F.3d at 349 ("[W]e agree that the vote sellers were not "victims" for Guidelines purposes.").  Therefore, we agree with Smith that the district court erred in enhancing his sentence under § 3A1.1.

argument that "cumulative errors in the case warrant reversal."  Because none of these arguments has any merit, we decline to address them in greater detail.

Smith also contends that he is entitled to resentencing in light of *Booker*. In addition to enhancing Smith's sentence under § 3A1.1, the district court added three levels to Smith's sentence based on a finding that Smith was a "manager or supervisor" of criminal activity "involving five or more participants or [that] was otherwise extensive." U.S.S.G. § 3B1.1(b) (2003). Smith argues that because he did not admit to the facts supporting this enhancement, and the enhancement was not proved to the jury beyond a reasonable doubt, his Sixth Amendment rights were violated and he is entitled to resentencing. Smith did not raise a Sixth Amendment claim before the district court, therefore we review his argument on appeal for plain error. *United States v. Oliver*, 397 F.3d 369, 377 (6th Cir. 2005). We agree with Smith that the district court's application of § 3B1.1(b), resting on judge-found facts, violated his Sixth Amendment rights, and under our post-*Booker* plain error cases, we find that the plain error test has been met in this case. *See*, *e.g.*, *United States v. Jackson*, 401 F.3d 747, 750 (6th Cir. 2005); *United States v. McDaniel*, 398 F.3d 540, 548-50 (6th Cir. 2005). Therefore, we remand Smith's case to the district court for resentencing in light of *Booker*.

### III.    CONCLUSION

For the above reasons, we **AFFIRM** Smith's and Newsome's convictions; however, we **VACATE** Smith's sentence and **REMAND** his case for resentencing in accordance with *Booker*.