RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0151p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
—————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KARL A. WHITE, JR.,

*Defendant-Appellant.*

No. 07-2404

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00029-001—Robert Holmes Bell, District Judge.

Argued: March 6, 2009

Decided and Filed: April 16, 2009

Before: KENNEDY, MARTIN, and COLE, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Martin J. Beres, LAW OFFICES OF MARTIN J. BERES, Clinton Township, Michigan, for Appellant. Matthew G. Borgula, UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Martin J. Beres, LAW OFFICES OF MARTIN J. BERES, Clinton Township, Michigan, for Appellant. Jennifer L. McManus, UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

—————————————

**OPINION**

—————————————

KENNEDY, Circuit Judge. Defendant Karl Alan White, Jr. received a life sentence for conspiracy to distribute crack and powder cocaine following a jury trial. All told, the jury found White guilty on seven counts: Count One, conspiracy to distribute cocaine and cocaine base ("crack cocaine"); Counts Two and Five, possession of cocaine base with the intent to distribute; Count Three, carrying a firearm during and in relation to a drug trafficking crime; Counts Four and Six, felon in possession of a firearm; and Count Seven,

1

possession of cocaine with the intent to distribute. On appeal, White argues that he was denied a fair trial as a result of erroneous discovery rulings, erroneous evidentiary rulings, and prosecutorial misconduct, and that the district court erred sentencing him to life in prison. For the following reasons, we affirm White's convictions but reverse his sentence and remand to the district court for re-sentencing in accordance with this opinion.

## BACKGROUND

The jury convicted White of participating in a drug conspiracy from 2003 to 2007 in the area of Kalamazoo, Michigan. Much of the evidence of the conspiracy arose out of four specific incidents: (1) the November 21, 2003 traffic stop; (2) the December 28, 2004 traffic stop; (3) the January 1, 2006 search; and (4) the January 22, 2007 drug bust. The government also presented more general evidence of White's drug dealing.

A.     November 21, 2003 Traffic Stop

On November 21, 2003, a Kalamazoo police officer stopped a Cadillac Escalade driven by White with a person named Shaquann Branson in the front passenger seat. Branson had crack cocaine on his person which the police discovered. Branson was charged and convicted in state court. The police also searched the vehicle and discovered a loaded Heckler & Koch .40 S&W Caliber semiautomatic pistol and 19.94 grams of crack cocaine in a sock underneath the driver's seat. Count Two arises from the discovery of the crack, and Counts Three and Four arise from the discovery of the gun.

At trial, Branson testified that, in addition to their friendship, White dealt him drugs. Branson started off buying small amounts of crack from White, but by 2005, he was purchasing from White a kilogram of powder cocaine per week, at times, for around $20,000. He purchased from White in this amount during 2005. Branson's girlfriend, Danyelle Sanders, corroborated his testimony by testifying herself to the fact that she accompanied Branson to purchase drugs from White during 2005 and 2006. Branson also testified to White's lavish lifestyle that included a number of expensive vehicles.

B.     December 28, 2004 Traffic Stop

On December 28, 2004, after observing a Buick LeSabre involved in a suspected drug deal, a Kalamazoo police officer stopped the LeSabre which was driven by Sharmeka Williams with White in the front passenger seat. On White's person, police found $8,350 in cash. After conducting a search of the vehicle, police found, inside of a duffel bag, rubber bands, a digital scale, and a container with a false bottom which housed 87 grams of crack cocaine. Count Five, possession of crack cocaine with the intent to distribute, arises out of this discovery of drugs.

White explained to officers at the scene that he had such a large sum of money on him in cash because he was a rapper that had several recordings and performed frequently with known artists. At trial, White testified that his only income came from being an unsigned rap artist who sold tracks to other artists, roofing and landscape jobs, and financial aid for college.

Williams testified at trial that she had a relationship with a man named "Tay" with whom she would sometimes swap cars. She would drive his white Mercedes and he would drive her Buick. This suggested that the duffel bag found in the Buick was Tay's, not White's. When asked who might have seen her driving the white Mercedes, Williams stated that Leniya Stafford may have seen her. The prosecution called Stafford in rebuttal, and she testified that she did not know Tay nor had she ever seen Williams driving a white Mercedes.

C.     January 1, 2006 Search

On January 1, 2006, a Kalamazoo police officer observed White and Branson leaving the scene of a shooting at a Days Inn. That officer radioed his observation to other officers. Another officer drove to the apartment of Leniya Stafford, White's girlfriend and the mother of their child. White was at Stafford's apartment. Stafford consented to a search of her apartment, whereupon the officer found a loaded Hi-Point Model C9, 9mm semiautomatic pistol in the child's bedroom where White often slept. Count Six, felon in possession of a firearm, comes from the discovery of that gun.

Stafford testified in front of a grand jury and at trial that White put the gun in the dresser drawer where the police discovered it and that White dealt drugs. At a bond

revocation hearing prior to trial, Stafford recanted her grand jury testimony and testified that she did not know where the gun came from. When asked about her grand jury testimony at trial, she explained that she feared White because he had threatened, choked, and beat her on multiple occasions. Stafford testified that on one such instance, White took Stafford to Don Sappanos, a lawyer, who had arranged for a polygraph to be administered to determine if Stafford had spoken with the Drug Enforcement Agency ("DEA") about White. Bernard Wogoman also testified that White attempted to contract him to blow up Stafford's garage and car.

> ### D.    January 22, 2007 Drug Bust

On January 22, 2007, the DEA arrested Kristinea Vaughn in a drug bust. In the weeks preceding the drug bust, the DEA recorded a series of conversations between White and Larry Tillman, a government informant, which set up the exchange of two kilograms of cocaine for $38,000. At trial, the prosecution introduced taped conversations between Tillman and White that occurred prior to and during the drug transaction at trial. In these conversations, they agreed to meet at a Cracker Barrel in Kalamazoo, but before the deal happened, White told Tillman that he would send a girl instead. White sent Vaughn to meet with Tillman. When the police arrested Vaughn, she was on the phone with White.

Tillman had pleaded guilty to conspiracy to distribute cocaine after police discovered four kilograms of cocaine in his car. He agreed to participate in a sting of White with whom he had a longstanding relationship with as a friend and a person from whom he had bought drugs and to whom he had sold drugs. Tillman testified that from 2003 to 2005, he bought approximately a quarter of a kilogram per week of powder cocaine for between $5,000 and $6,000. In 2005, Tillman had found a cheaper supplier and began to sell to White, in 2005, in the amount of five kilograms for $96,000 on a regular basis. Over a six month period, Tillman sold White $600,000 worth of cocaine. He also testified to White's lavish lifestyle which included a number of cars and up to $400,000 in cash on his person.

**ANALYSIS**

I.    Discovery

White argues that the district court erred in permitting expert testimony from Officers Bagley and Vanderklok regarding tools of the drug trade. Bagley stopped White on November 21, 2003, and Vanderklok stopped White on December 28, 2004. They both testified to tools of the drug trade with regards to the characteristics of the evidence found during their respective stops of White. Rule 16 of the Federal Rules of Criminal Procedure requires that "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." The government did not provide notice of either officer's expert testimony. We review the district court's discovery ruling for abuse of discretion. *United States v. Quinn*, 230 F.3d 862, 866 (6th Cir. 2000).

This argument fails because White has not shown prejudice, as testimony regarding tools of the trade has become utterly routine in drug distribution cases, particularly when we review the district court's ruling for abuse of discretion. *See id.* (arguing that "it is difficult to imagine that [the defendant's] counsel, an experienced attorney, would fail to realize that the government would offer testimony that the amount of crack cocaine found in [the defendant's] car was more consistent with distribution than with possession for personal use"); *see also United States v. Thomas*, 99 F. App'x 665, 669 (6th Cir. 2004) (unpublished) (citing favorably other circuits for the proposition that "[m]ost courts have taken a very tolerant view of the admissibility of expert testimony linking the presence of firearms to drug trafficking activities"); *United States v. Ortega*, 150 F.3d 937, 943 (8th Cir. 1998) (noting that expert evidence explaining "drug-related activities and paraphernalia" has become "routine in drug cases and has been approved in [the Eighth] [C]ircuit" such that the district court did not abuse its discretion in allowing such expert evidence without proper disclosure by the government).

Two circumstances buttress the conclusion of lack of prejudice here: (1) White's counsel did not ask for a continuance; and (2) White's counsel did not object to the qualifications of the police officers to testify on these issues. In *Quinn*, we emphasized that a request for a continuance would have suggested that White could have "discredited [the

officers'] testimony." 230 F.3d at 866. White's failure to request a continuance suggests his inability to demonstrate that the lack of notice prejudiced his case. *Id.* Similarly, White never claimed that either officer was unqualified to testify about the tools of the drug trade. During Officer Vanderklok's testimony, White's counsel objected for lack of notice, but never suggested that either Officer Vanderklok or Officer Bagley was unqualified to testify on the topic. The district court noted this by stating in response to White's counsel's objection that "[t]he jury gives [the expert testimony] whatever weight they believe it deserves." In other words, the "surprise" expert testimony of the officers neither left White without recourse to ask for a continuance, nor did it allow un-expert or unreliable information to be placed before the jury. Thus, White has no argument that he was prejudiced.

II.     Evidence

We review district court evidentiary rulings for abuse of discretion. *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004). "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *Id.* (quoting *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002)). "Relevant evidence means having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (quoting Fed. R. Evid. 401) (internal quotations marks omitted).

A.      Spoliation

White argues that the district court erred in allowing testimony that Sappanos, a lawyer, assisted White with the obstruction of justice. However, White, in his brief, never identifies why the district court erred in admitting this evidence. Evidence that White attempted to obstruct justice with the help of Sappanos by giving Stafford a polygraph test to see if she snitched on him to the government is admissible to show "consciousness of guilt." *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986).

The evidence that White beat Stafford was admissible to explain Stafford's prior inconsistent testimony. *United States v. Smith*, 139 F. App'x 681, 686 (6th Cir. 2005)

(unpublished) (citing *United States v. Maddox*, 944 F.2d 1223, 1229-30 (6th Cir. 1991)). Stafford testified at trial that White choked her after she spoke with the DEA after the January 1, 2006 gun incident in which she told police that a gun found in her home belonged to White. He also told her to refrain from speaking to law enforcement about drugs, set her clothes on fire, threatened her, and beat her on multiple other occasions, once while she was pregnant, and on another occasion so severely that White inflicted permanent damage to Stafford's right eye. In front of the grand jury, Stafford testified that the gun found in her home was Stafford's, and she also testified to White's other drug trafficking activities. At the bond revocation hearing, Stafford recanted her testimony and said that she lied to the grand jury. Stafford testified at trial consistent with her grand jury testimony, explaining that she recanted her testimony because she feared White. The district court did not err in admitting Stafford's testimony of the beatings to allow her to explain why her testimony changed. *Maddox*, 944 F.2d at 1229-30 (allowing a witness to retake the stand and give new testimony that corrected prior testimony with the explanation that she felt threatened when she perceived that the defendant had mouthed "you're dead" to her while she was on the stand).

### B.     Direct Evidence of Criminal Activity

White argues that testimony that Sappanos gave White advice on avoiding law enforcement detection was admitted in error. But Sappanos's suggestion that White publicize himself as a rap artist and avoid the use of Nextel phones explains how White went about conducting his drug trafficking business. White was on trial for a drug trafficking conspiracy offense. Therefore, the evidence explaining the way White went about conducting his drug trafficking business to avoid detection was direct evidence of the intent to further a drug trafficking conspiracy that makes his behavior a crime. At the very least, the failure of White to object to the evidence pertaining to the avoidance of law enforcement detection relegates our review to that of plain error, which White cannot demonstrate.

The district court did not abuse its discretion in allowing testimony that White carried firearms on his person for the same reasons. White was charged with two counts of felon in possession of a firearm and one count of carrying a firearm during a drug trafficking crime. The testimony then was direct evidence that White committed crimes for which he

was charged. In addition, "[e]vidence of weapons, including firearms, is relevant to proving intent or a conspiracy to distribute drugs." *United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008) (quoting *United States v. Randolph*, No. 97-5990, 173 F.3d 857, 1999 WL 98564, at *4 (6th Cir. Jan. 27, 1999)).

Finally, the district court did not permit the use of extrinsic evidence to impeach a witness on an irrelevant collateral matter in error when it allowed the government, in rebuttal, to impeach Sharmeka Williams's testimony with testimony from Leniya Stafford. *Cf. United States v. Markarian*, 967 F.2d 1098, 1102 (6th Cir. 1992). On December 28, 2004, the police stopped a Buick and found drugs and tools of the drug trade in a duffel bag. Williams suggested that the bag belonged to a man named Tay with whom she often swapped cars. He would drive her Buick and she would drive his white Mercedes. When asked if anyone had seen her drive the white Mercedes, Williams stated that "it [was] possible" that Stafford had. The government called Stafford to the stand in rebuttal to refute this story. Whether Tay and Williams swapped cars went directly to the question of whether the duffel bag found in the car belonged to Tay or to White. The matter at issue was not an irrelevant collateral matter; rather, it bore directly on White's guilt.

III.     Prosecutorial Misconduct

We review prosecutorial misconduct for abuse of discretion. *United States v. Rose*, 522 F.3d 710, 715 (6th Cir. 2008). First, we must determine if the prosecutor's behavior was improper. *Id.* at 716. If so, "we must determine if the [prosecutor's] remarks were flagrant and warrant reversal." *Id.* (quoting *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003)) (internal quotation marks omitted). To determine the flagrancy of the prosecutor's remarks, we look at "(1) whether the statements tended to mislead the jury and prejudice the defendant; (2) whether the statements were isolated or pervasive; (3) whether the statements were deliberately placed before the jury; and (4) whether the evidence against the accused is otherwise strong." *Id.* (quoting *Galloway*, 316 F.3d at 632).

White argues that the prosecutor acted improperly in conducting a highly prejudicial cross examination of him at trial. True, the cross-examination was argumentative and contentious. The prosecutor did interrupt White on multiple occasions, but White for his part failed to answer questions posed to him and also answered questions with questions or

arguments. White points us to *Boyle v. Million*, 201 F.3d 711 (6th Cir. 2000), for the proposition that "badgering and interrupting a witness, name-calling, predicting that the defendant will lie on the stand, and stating before the jury that the defendant is in need of psychiatric help" amounts to prosecutorial misconduct, *id.* at 717, and we do not disagree. In contrast to misconduct by the prosecutor there, the prosecutor here did indeed interrupt White on multiple occasions, but he did so because White was not answering the question posed. Standing alone, that does not rise to the level of prosecutorial misconduct.

Otherwise, the prosecutor did not act improperly during his cross-examination of White. He attempted to impeach White by inquiring about basic music-related concepts, because White claimed to support a lavish lifestyle in part based on money earned as a rap artist. A question about the income taxes of White's aunt Debi Brown-Taylor may have been improper, but it was withdrawn after White's objection for lack of foundation. Finally, the questions regarding the Days Inn shooting were relevant to understanding White's role in the shooting and its aftermath.[1]

White argues that the prosecutor also committed reversible error in his closing remarks. Because White did not object to the statements at trial, plain error review applies. *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). Plain error review involves four steps: we determine (1) whether "an error has been made" that is (2) plain and (3) "affects the defendant's substantial rights," and if so, (4) we decide whether to exercise our discretion to correct the error. *Rose*, 522 F.3d at 716. Reversible error exists "only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *Id.* (quoting *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994)) (internal quotation marks omitted).

First, the prosecutor's closing arguments regarding unexplained wealth, in the realm of "millions of millions" of dollars were supported by the evidence.[2] Therefore,

---

[1] The prosecutor asked White: "Reinaldo Morales and Shaquann Branson were two of your closest friends, correct?" That question was part of a line of questioning placing White at the scene of the Days Inn shooting.

[2] The prosecutor invoked the statement of "millions of millions of dollars" in the following portion of his closing argument:

the prosecutor did not commit error in making those remarks. Tillman testified that he saw White deal in amounts up to $400,000. The evidence permitted the inference that White had purchased a number of expensive cars. Other witnesses testified that they purchased drugs from White on a regular basis that totaled a significant sum not outside of the realm of millions of dollars. Also, witnesses testified that White would spend thousands of dollars on just one night out partying. The one comment in which the prosecutor committed error was in stating that White had "never paid taxes in [his] life." The parties only stipulated to the fact that White had not paid taxes from 2003 to 2006. That error alone is not enough to constitute reversible error on plain error review where we reverse "only in exceptional circumstances." *Id.*

Similarly, White points to comments made by the prosecutor which may amount to error–satisfying step one of plain error review–but do not amount to reversible error. White asserts that the prosecutor injected his personal opinion as to the credibility of witnesses during closing argument. On a few separate occasions, the prosecutor called the testimony of White's witnesses "ridiculous" and the prosecutor referred to White's testimony as "offensive." This argument fails because the prosecutor argued the facts primarily, and only punctuated his remarks by calling the stories conjured up by White and his witnesses "ridiculous." In *Collins*, we determined that far more flagrant personal opinions did not amount to reversible error where the prosecutor commented, inter alia, that "the witnesses must think we drive turnip wagons if they expect you to believe this tale," "when the DLJ witnesses swore to tell the truth they demonstrated from the tales they told that they have a lot of contempt for the people in Kentucky," and "I might deserve an Academy Award for not laughing when defense counsel said the payments were motivated by desire." 78 F.3d at 1039 n.14. As in *Collins*, comments by the prosecution were wholly unnecessary, however the errors were harmless as the

---

Members of the jury, for the last four years this defendant has been flooding west Michigan with cocaine and crack cocaine, putting it out there on the streets. And for the last four days you've heard all the proof of that. What's been going into his pockets? Millions and millions of dollars.
. . . .
And what's been going into his pockets? Like I said, millions and millions of dollars. Duffel bags full of cash. $20,000 at a pop, what honest people make in a year.

prosecutor here largely argued the facts presented to the jury, did not "misle[a]d the jury" nor did he "remove the issue of credibility of witnesses from the jury." *Id.* at 1040.

White argues that the prosecutor shifted the burden of proof during closing argument.[3] White argues that the prosecutor did this by both: (1) arguing that White's defense was not supported by his evidence; and (2) pointing out the failure of White to produce evidence he testified that he had. These arguments fail because the prosecutor is permitted to "summarize the evidence and comment upon both its quantitative and qualitative significance." *United States v. Drake*, 885 F.2d 323, 324 (6th Cir. 1989). However, the following comment by the prosecution came very close to crossing the line into flagrancy: "What other kind of proof did [White] bring in to establish that he's not a drug dealer?" This "specifically [] call[ed] attention to [White's] failure to produce evidence." *Id.* Were it not for the district court's clear instructions to the jury that the government bears the burden of proof, the jury may have been confused by the prosecutor's closing arguments into believing that the law required White to disprove the government's criminal charges. But before the parties' opening statements, the

---

[3]White points to the following passage from the prosecutor's closing argument.

> What other kind of proof did he bring in to establish that he's not a drug dealer? A guidance counselor who said he makes it to his appointments most of the time, except when he doesn't. A guy who says, I think I sold his cousin a car once. And another guy who says, I helped him put wheels on his car. Can you explain how that proves he's not a drug dealer, that he wasn't talking about what he's obviously talking about on the tape? This whole rap career is completely fabricated.
> Think about what's not here, the evidence that's not here that you would expect. If he's making all this money from some legitimate source, where is the documentation? Where are the pay stubs? Where is the paycheck? Anything like that to prove it. Where is the record contract? Doesn't have one. Where is the newspaper man who is helping him set up the DEA for this investigative journalism story? Where are the CDs? If he's got this big rap career and he's been under indictment the whole time waiting for his big day where he's gonna prove his innocence, he didn't think to bring one CD in here to prove to you that he's a rap artist.
> You know where the CDs are? They're at his mom's house with the magical part of the tape that proves that he's innocent. Do you recall that? There's a piece of the tape that I have at home, and I can go get it if you wanted me to, that proves that I was never gonna go through with a drug deal. All this time, he didn't bring it, his mom didn't bring it. Oh, my mom's too busy. She's been sitting back here for three days. Your son's on trial for his life and you got the evidence that's gonna prove he's innocent. Aw, shucks. You gonna forget to bring that? Unbelievable the things he'll tell you from the stand.
> The fact is the money came from drugs. For four years he has been flooding the streets with drugs, cocaine and crack cocaine. For four years he has been having his way through threats, violence, and intimidation. That's what he's been doing for the last four years.

district court emphasized that White "is presumed innocent and would remain presumed innocent unless you [the jury] found unanimously after deliberating that he was guilty of the count . . . [a]nd therefore, the government has that burden of proving his guilt beyond a reasonable doubt." The district court's final jury instructions, following closing argument and before the jury deliberated on the verdict, reiterated that the "presumption of innocence stays with [White] unless the government presents evidence before you [the jury] here in this courtroom that overcomes that presumption and convinces you beyond a reasonable doubt that he is guilty." Under plain error review, assuming error but not deciding the question, reversible error did not occur because the district court's preliminary and final jury instructions cured any prejudice that the prosecutor's comments may have invited onto White regarding the burden of proof. *See*, *e.g.*, *United States v. Venable*, 269 F.3d 1086, 1091 (D.C. Cir. 2001).

For the forgoing reasons, we find no reversible error and affirm White's convictions.

IV.    Sentencing

White argues that the district court erred in determining the amount of cocaine attributable to him so that his base offense level should be 36, not 38. The amount of cocaine attributable to White as part of the conspiracy is a factual finding that we normally review for clear error. *United States v. Samuels*, 308 F.3d 662, 670 (6th Cir. 2002) (citing *United States v. Jenkins*, 4 F.3d 1338, 1345-46 (6th Cir. 1993)). However, at sentencing, White only objected to the credibility of the witnesses with regard to quantity. His attorney "agreed that if the testimony that was presented is believed, it greatly exceeds [the 150 kilogram] threshold amount." In other words, White argued at sentencing that the district court ought to disbelieve as exaggerations the amounts to which the witnesses testified. He did not argue that the district court's drug quantity determination lacked foundation in the record or that the drug quantity was otherwise miscalculated even assuming the credibility of the witnesses. The government argues then that we should only review for plain error because the latter argument urged by White is a new argument on appeal. We need not decide this question because the error

here satisfies the more stringent plain error review so as to satisfy clear error review as well.

As above, to show a sentence's plain error, White "must satisfy the following criteria: (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005) (quoting *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998)) (internal quotation marks omitted).

"A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice . . . ." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). "[T]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004) (quoting *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)). The drug quantity estimate must "err[] on the side of caution and likely underestimate[] the quantity of drugs actually attributable to the defendant." *Anderson*, 526 F.3d at 326. At sentencing, the district court judge here determined that 300 kilograms of cocaine was a conservative estimate, much less the 150 kilograms of cocaine that triggers a base offense level of 38.

Both in its sentencing memorandum,[4] and at sentencing,[5] the government erroneously argued that Tillman had supplied White with five kilograms of cocaine per week for a year and a half. The government used the five kilograms per week for a year and a half to conclude that White's dealings with Tillman alone would amount to approximately 400 kilograms of cocaine (5 kilograms/week x 52 weeks/year x 1.5

---

[4] The government cited to Tillman's testimony for the proposition that: "From June 2005 to November 28, 2006, Tillman was White's supplier, and sold him five kilograms of cocaine per week. Even using conservative estimates, this level of trafficking encompasses well over 400 kilograms of cocaine."

[5] Referring to Tillman's testimony during sentencing, the government stated that "Tillman testified about five kilograms a week for about a year and a half . . . ."

years).  Again on appeal, the government cites to its sentencing memorandum to argue for the 400 kilograms figure.  At trial, Tillman first testified that for a six month period, from June 2005 through November 2005, he sold White 5 kilograms of cocaine per week.  On further questioning by the government, Tillman contradicted himself and testified to dealing with White in $100,000-worth of cocaine per month for the same six month period–which corresponds with 5 kilograms per month for that six month period.  This lesser estimation–five kilograms per month for six months results in only 30 kilograms of cocaine that can be attributed to White through his dealings with Tillman over those six months.  None of the parties corrected this misunderstanding.  The district court must use conservative estimates in the amount of cocaine it attributes to the defendant as part of its base offense level, which means looking to the correct duration of White and Tillman's dealings and taking the lesser of the two amounts to which Tillman testified.  *See Anderson*, 526 F.3d at 326.

At sentencing, in evaluating the amount of powder cocaine at issue, the district court emphasized its reliance on the dealings between White and Tillman, stating:

> Well, this much appears to the Court, and that is that it was abundantly clear throughout this trial . . . that there were considerable amounts of drugs and monies that were coming through and that these monies and drugs were largely revolving around Mr. White and his operation.  Mr. Wogoman, Mr. Tillman, extensively Mr. Tillman at great length concerning quantities and amounts, and Kristinea Vaughn's testimony.

First, the district court's language emphasized that it relied heavily on the amount of cocaine transacted between White and Tillman, as it noted the "considerable amounts of drugs and monies" involving "extensively Mr. Tillman at great length concerning quantities and amounts."  Second, White dealt with Wogoman and Vaughn–the other two persons whose dealings with White the district court explicitly relied upon–at most in amounts of cocaine of five or six kilograms, "three or four" in a deal observed by Wogoman and two attributed to Vaughn.  This accounts for a tiny proportion of the 150 kilograms needed to trigger the base offense level of 38 and the 300 kilograms the district court indicated that the evidence supplied by Wogoman, Tillman, and Vaughn supported.  To get to 150 kilograms, much less 300 kilograms, the district court then

must have relied primarily upon the amount dealt between White and Tillman in far excess of 30 kilograms, the conservative estimate to which Tillman testified. Therefore, error existed in the district court that was plain, in satisfaction of prongs one and two of plain error review.

The error affected White's substantial rights. In other words, the error was prejudicial. *Davis*, 397 F.3d at 349 (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). Absent the erroneous Tillman amount, the other amounts of drug dealings explicitly detailed by the government's witnesses, taken together–and taken conservatively–do not necessarily amount to the 150 kilogram threshold for a base offense level of 38. The government's sentencing memorandum and its brief on appeal cite to testimony from Branson and Ervin Fance,[6] in addition to Tillman's testimony. Branson testified to one kilogram per week for "a couple of months out of 2005," which gives us an estimate of eight kilograms.[7] Fance testified to one kilogram per week from December 2004 until Fall 2006, which gives us an estimate of 91 kilograms. Wogoman testified to seeing a deal for three to four kilograms of cocaine giving a conservative estimate of three kilograms. Tillman's testimony can be construed as having only 30 kilograms sold by Tillman to White from June 2005 through November 2005. In addition, Tillman testified that from some time in 2003 until "the tables turned,"[8] he bought one eighth of a kilogram (equivalent to four and a half ounces) per week from White, which gives us a conservative estimate of 11 kilograms of powder cocaine (estimating the starting point conservatively as September 2003). Upon further questioning from the prosecutor, Tillman agreed with the prosecutor's statement that "from 2003 till June or so of 2005 you bought about a quarter kilo a week from [White]." Similar to the five kilograms per week later in 2005, the government argued that Tillman

---

[6]Fance, who was not involved in any of the four specific incidents described in the facts section, testified to drug transactions–the circumstances of the transactions and the amounts–he had with White from 2004 to 2006. He also testified to White's lavish lifestyle and lack of other sources of income.

[7]Branson testified to dealing with White in amounts of powder cocaine less than one kilogram during 2005 but not with any clarity or specificity to allow a conservative estimation of the amount.

[8]Tillman testified that "the tables turned" in June 2005 when he "turned" from buyer to seller in his dealings with White.

testified to a quarter of a kilogram per week from 2003 until June 2005, without acknowledging that Tillman had also testified to an eighth of a kilogram per week from 2003 until June 2005. Neither of the parties nor the district court addressed this issue, either, likely because they all mis-perceived that Tillman had clearly testified to drug amounts in the vicinity of 400 kilograms. Finally, the Tillman drug bust involved two kilograms of powder cocaine. Taking the conservative estimates testified to by these witnesses, the drug amount of powder cocaine appears to fall short of the 150 kilogram threshold, weighing in at only 145 kilograms (8 kilograms + 91 kilograms + 3 kilograms + 11 kilograms + 30 kilograms + 2 kilograms).

Finally, we decide to exercise our discretion to remand in this case. On plain error review, an appeals court can deny remand even if an error exists, it is plain, and it affects substantial rights. *Id.* Federal Rule of Criminal Procedure 52(b) governs plain error review, and it permits remand in the case of plain error, but does not require it. *Olano*, 507 U.S. at 735. We decide to exercise our discretion here because White received a life sentence. With a total offense level of 43 and a criminal history category of IV, the Guidelines range is life imprisonment. U.S.S.G. § 5A. A base offense level of 36 rather than 38 would result in a total offense level of 42,[9] which gives a Guidelines range of 360 months' imprisonment to life. White is a young man–29 years old. We do not impose a life sentence lightly, and particularly so when the district court has committed prejudicial plain error. Therefore, we choose to exercise our discretion and vacate White's sentence.

Other witnesses testified to drug activity which may permit a greater total or there may be additional testimony from the witnesses listed that indicates a greater amount of powder cocaine at issue which the district court can consider upon re-sentencing.[10] However, we have identified clear error in the district court's calculation

---

[9]White's total offense level with a base offense level of 38 was 44, but any total offense level above 43 is reduced to 43 pursuant to U.S.S.G. § 5A, Application note 2.

[10]Should the district court on re-sentencing choose to sentence White under the crack cocaine amount, its attention is called to the Supreme Court's decisions in *Kimbrough v. United States*, 128 S.Ct. 558 (2007), and *Spears v. United States*, 129 S.Ct. 840 (2009). Both 150 kilograms of powder cocaine and 1.5 kilograms of crack cocaine suffice to trigger the base offense level of 38. At the original sentencing

of the drug amounts upon which it appeared to have relied in sentencing.  For these reasons, while we affirm White's convictions, we remand to the district court for re-sentencing of the defendant.

---

hearing, the district court calculated the drug amount only with respect to powder cocaine which alone sufficed to trigger the 38 base offense level.